**THE ROSEN LAW FIRM, P.A**.
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827

Counsel for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-3267

DANA ARMBRUSTER, INDIVIDUALLY AND
ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,

Plaintiffs,

v.

GAIA, INC.,
JIRKA RYSAVY; and
PAUL TARELL,

Defendants.

**PLAINTIFF'S CLASS ACTION COMPLAINT**
**FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Plaintiff Dana Armbruster ("Plaintiff") individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Gaia, Inc. (collectively "Gaia" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased the securities of Gaia for the time period December 26, 2017 through and including November 7, 2022 (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Gaia produces and sells subscriptions to its web-based content, which consists of yoga and meditation, among other topics.

3.      During the Class Period Gaia, Company founder, Chief Executive Officer ("CEO"), and Chairman Jirka Rysavy; and Company Chief Financial Officer ("CFO") Paul Tarell misrepresented to investors the Company's subscriber growth, business prospects, adequacy of internal controls, and concealed an ongoing SEC investigation.

4.      As a result of this adverse information, Plaintiffs and the class were damaged.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

6.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

7.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as a substantial part of the conduct complained of herein occurred in this District.

8.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

9.       Plaintiff Dana Armbruster as set forth in the accompanying certification, incorporated by reference herein, purchased Gaia securities at artificially inflated prices during the Class Period and have been damaged thereby.

10.       Defendant Gaia is a Colorado corporation with its principal executive offices located at 833 West South Boulder Road, Louisville, Colorado 80027. At all relevant times herein, Gaia's common stock was listed on the NASDAQ Stock Exchange. From the beginning of the Class Period to the present time, the Company was known as Gaia, Inc. and its common stock was listed under ticker symbol "GAIA."

11.       Gaia purports to be a "global conscious media and community company that operates a global digital video subscription service that caters to a unique and underserved subscriber base." It releases video content focused on yoga, meditation, spirituality, as well as on extraterrestrials and other niche topics.

12.       Defendant Jirka Rysavy ("Rysavy") at all relevant times herein was the Company's founder, CEO, and Chairman.

13.       Defendant Paul Tarell ("Tarell") at all relevant times herein was the Company's CFO.

14.       Rysavy, and Tarell are collectively referred to hereinafter as the "Individual Defendants."

15.       It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that dissemination of the false, misleading and incomplete information conveyed

in the Company's public filings, press releases and other publications as alleged herein is the result of collective actions of the narrowly defined group of defendants identified above. Each of the above officers and directors of Gaia and its subsidiaries and affiliates, by virtue of his position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

16.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the securities of Gaia during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Gaia securities were actively traded on the NASDAQ stock exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records

maintained by Gaia or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Gaia; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS
## BACKGROUND

22.    On November 6, 2017, Gaia disseminated a press release announcing results for the third quarter of 2017, which was filed the same with the SEC on Form 8-K. In this release, the Company purported to have achieved a paying subscriber count of 311,000 on September 30, 2017, up from 180,000 one year prior, or a 73% subscriber growth rate from 46% in the third quarter of 2016.

23.    Then, the Company filed its quarterly report on November 7, 2017 for the period ended September 30, 2017. The Form 10Q was signed and separately certified by Defendants Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

24.    The Q3 2017 10-Q did not reveal any internal control weaknesses. The Q3 2017 10-Q states in pertinent part:

> "Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of September 30, 2017, **our management has concluded that those disclosure controls and procedures are effective**."

(Emphasis added.)

25.    The Class Period begins on December 26, 2017, as the statements made in the November 6, 2017 press release and 10-Q filed on November 7, 2017 were still live through that date.

26.     On April 29, 2019, the Company issued a press release falsely announcing "34% subscriber growth" for Q1 2019, an increase to 562,000 paying subscribers from 418,200 on March 31, 2018. The Company reported that this subscriber growth led to a 36% increase in revenues.

27.     That same day the Company filed its Q1 2019 results on Form 10Q with the SEC. The Form 10Q was signed and separately certified by both Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

28.     The Q1 2019 10-Q did not reveal any internal control weaknesses. The Q1 2019 10-Q states in relevant part:

> "Our management, ***with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures***, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of March 31, 2019, ***our management has concluded that those disclosure controls and procedures are effective***."

(Emphasis added.)

29.     On August 6, 2019, the Company filed its Q2 2019 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

30.     The Q2 2019 10-Q did not reveal any internal control weaknesses. The Q2 2019 10-Q states in relevant part:

"Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures**, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of June 30, 2020, **our management has concluded that those disclosure controls and procedures are effective**."

(Emphasis added.)

31.     On November 5, 2019, the Company filed its Q3 2019 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

32.     The Q3 2019 10-Q did not reveal any internal control weaknesses. The Q3 2019 10-Q states in relevant part:

"Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer,** conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of September 30, 2019, **our management has concluded that those disclosure controls and procedures are effective**."

(Emphasis added.)

33.     On February 24, 2020, the Company filed its Q4 2020 results on Form 10-K with the SEC. The Form 10-K was signed and separately certified by Defendants Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

34.     The 2020 10-K (reporting on Q4 2019) did not reveal any internal control weaknesses. It states in relevant part:

"Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design

and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended. Based upon their evaluation as of December 31, 2019, **_our management has concluded that those disclosure controls and procedures are effective_**."

(Emphasis added.)

35.     On April 27, 2020, the Company filed its Q1 2020 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

36.     The Q1 2020 10-Q did not reveal any internal control weaknesses. The Q1 2020 10-Q states in relevant part:

> "Our management, **_with the participation of our Chief Executive Officer and Chief Financial Officer_**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of March 31, 2020, **_our management has concluded that those disclosure controls and procedures are effective_**."

(Emphasis added.)

37.     On August 3, 2020, the Company filed its Q2 2020 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

38.     The Q2 2020 10-Q did not reveal any internal controls weaknesses. The Q2 2020 10-Q states in relevant part:

> "Our management, **_with the participation of our Chief Executive Officer and Chief Financial Officer_**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-

15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of June 30, 2020, ***our management has concluded that those disclosure controls and procedures are effective***."

(Emphasis added.)

39.    On November 9, 2020, the Company filed its Q3 2020 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by both Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

40.    The Q3 2020 10-Q did not reveal any internal controls weaknesses. The Q3 2020 10-Q states in relevant part:

"Our management, ***with the participation of our Chief Executive Officer and Chief Financial Officer***, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluations as of September 30, 2020, ***our management has concluded that those disclosure controls and procedures are effective***."

(Emphasis added.)

41.    On Sunday, February 14, 2021, *Business Insider* released an article called "Gaia was a wildly popular yoga brand. Now it's a publicly traded Netflix rival pushing conspiracy theories while employees fear the CEO is invading their dreams," revealing internal and management control weaknesses--particularly the domineering and controlling nature of Rysavy and Tarell and the poor tone at the top within the Company. *Business Insider* published a follow up article on February 17, 2021, called "Gaiam, one of the world's most popular yoga mats, has its roots in a conspiracy site that touts alien secrets and 9/11 theories"—raising further doubts about the legitimacy of management controls within the company.

42.     These articles caused the price of the Company's stock to fall from $9.82/share on February 12 to $9.62/share on February 17, 2021.

43.     On March 2, 2021, the Company filed its Q4 2020 results on Form 10-K with the SEC. The Form 10-K was signed and separately certified by Defendants Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

44.     The 2021 10-K (reporting on Q4 2020) did not reveal any internal control weaknesses. It states in relevant part:

> "Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended. Based upon their evaluation as of December 31, 2020, **our management has concluded that those disclosure controls and procedures are effective**."

(Emphasis added.)

45.     On May 3, 2021, the Company filed its Q1 2021 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

46.     The Q1 2021 10-Q did not reveal any internal controls weaknesses. The Q1 2021 10-Q states in relevant part:

> "Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of March 31, 2021, **our management has concluded that those disclosure controls and procedures are effective**."

(Emphasis added.)

47.     On August 2, 2021, the Company filed its Q2 2021 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

48.     The Q2 2021 10-Q did not reveal any internal controls weaknesses. The Q2 2021 10-Q states in relevant part:

> "Our management, ***with the participation of our Chief Executive Officer and Chief Financial Officer***, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of June 30, 2021, ***our management has concluded that those disclosure controls and procedures are effective***."

(Emphasis added.)

49.     On November 1, 2021, the Company filed its Q3 2021 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

50.     The Q3 2021 10-Q did not reveal any internal controls weaknesses. The Q3 2021 10-Q states in relevant part:

> "Our management, ***with the participation of our Chief Executive Officer and Chief Financial Officer***, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of September 30, 2021, ***our management has concluded that those disclosure controls and procedures are effective***."

(Emphasis added.)

51.     On February 28, 2022, the Company filed its Q4 2021 results on Form 10-K with the SEC. The Form 10-K was signed and separately certified by Defendants Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

52.     The 2022 10-K (reporting on Q4 2021) did not reveal any internal control weaknesses. The 2021 10-K states in relevant part:

> "Our management, ***with the participation of our Chief Executive Officer and Chief Financial Officer***, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K were effective*** in providing reasonable assurance that information required to be disclosed by us in reports that we file or submit under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, ***and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.***"

(Emphasis added.)

53.     On May 2, 2022, the Company filed its Q1 2022 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

54.     The Q1 2022 10-Q did not reveal any internal controls weaknesses. The Q1 2022 10-Q states in relevant part:

> "Our management, ***with the participation of our Chief Executive Officer and Chief Financial Officer***, conducted an evaluation of the effectiveness of the design

and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of March 31, 2022, ***our management has concluded that those disclosure controls and procedures are effective***."

(Emphasis added.)

55.     On August 1, 2022, the Company filed its Q2 2022 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Rysavy and Tarell pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

56.     The Q2 2022 10-Q did not reveal any internal controls weaknesses. The Q2 2022 10-Q states in relevant part:

"Our management, ***with the participation of our Chief Executive Officer and Chief Financial Officer***, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of June 30, 2022, ***our management has concluded that those disclosure controls and procedures are effective***."

(Emphasis added.)

57.     The statements referenced in ¶¶ 22-40 and 43-56 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's Q1 2019 subscriber count was overstated; (2) the Company lacked adequate internal controls; as a result (3) Defendants had a heightened risk of regularly scrutiny and ultimately subject to an SEC investigation and action; and (4) as a result of the foregoing, as a result of the foregoing, defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

58.     On November 7, 2022, the Company revealed for the first time an SEC proceeding relating to the Company overstating its subscriber count. The 10-Q states in relevant part:

> "In June 2020, Gaia received a request for voluntary production of documents in an investigation by the staff of the Denver Regional Office (the "Staff") of the U.S. Securities and Exchange Commission (the "SEC"). Since that time, Gaia has responded to the initial voluntary requests and subsequent subpoenas issued by the Staff. In September 2022, Gaia and Gaia's Chief Financial Officer ("CFO") reached an agreement in principle with the Staff on a framework for a complete resolution of the investigation. The agreement in principle contemplates that Gaia would consent, without admitting or denying any findings, to the entry of an administrative order: (1) finding that Gaia (a) misstated in its April 29, 2019 earnings release and earnings call the number of paying subscribers for the period ending March 31, 2019, a quarter during which Gaia extended a free month of service to certain subscribers in the midst of a transition to a new enterprise-wide data system and (b) failed to comply with SEC whistleblower protection requirements with respect to the termination of one employee and the language used in severance agreements for other employees; and (2) requiring Gaia to pay a total civil monetary penalty of $2,000[,000] over a one-year period for these violations. At the same time, the CFO would consent, without admitting or denying any findings, to the entry of an administrative order: (1) finding that the CFO caused Gaia's misstatements in the April 29, 2019 earnings release and earnings call that is described above; and (2) requiring the CFO to pay a civil monetary penalty of $50[,000]. The contemplated settlement with Gaia and the CFO involve violations that require only negligence rather than intentional conduct. There can be no assurance that the contemplated settlement will be finalized and approved. Based on Gaia's agreement in principle with the Staff, however, Gaia has accrued a liability in the amount of $2,000[,000]. This liability is included in Accounts payable, accrued and other liabilities on the accompanying condensed consolidated balance sheets and as a separate line in the condensed consolidated statements of operations."

59.     Had the Plaintiffs and the Class been aware of the adverse information they would not have purchased the Company's securities at all or would not have purchased such securities at the artificially inflated prices at which they did.

### Applicability of Presumption of Reliance:

### Fraud on the Market Doctrine

60.     At all relevant times, the market for Gaia's common stock was an efficient market for the following reasons, among others:

(a)      Gaia's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)      During the class period, on average, several hundreds of thousands of shares of Gaia stock were traded on a weekly basis, demonstrating a very active and broad market for Gaia stock and permitting a *strong* presumption of an efficient market;

(c)      As a regulated issuer, Gaia filed with the SEC periodic public reports during the Class Period;

(d)      Gaia regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)      Gaia was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f)      Numerous NASD/FINRA member firms were active market-makers in Gaia stock at all times during the Class Period (highlighted in case we need to fact check); and

(g)      Unexpected material news about Gaia was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

61.      As a result of the foregoing, the market for Gaia's common stock promptly digested current information regarding Gaia from all publicly available sources and reflected such

information in Gaia's stock price. Under these circumstances, all purchasers of Gaia's common stock during the Class Period suffered similar injury through their purchase of Gaia's common stock at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

62.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Gaia who knew that those statements were false when made.

## FIRST CLAIM

**Violation of Section 10(b) Of
The Exchange Act Against and Rule 10b-5
Promulgated Thereunder Against All Defendants**

63.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase and sell Gaia's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

65.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Gaia's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

66.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Gaia as specified herein.

67.     These Defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Gaia's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Gaia and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein,

and engaging in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Gaia's securities during the Class Period.

68.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these Defendants was aware of the Company's dissemination to the investing public of information that they knew or recklessly disregarded to be materially false and misleading.

69.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public Gaia's operating condition and future business prospects and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by

deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

70.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Gaia's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Gaia's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Gaia securities during the Class Period at artificially high prices and were or will be damaged thereby.

71.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Gaia's financial results, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Gaia securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

72.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

73. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

74. This action was filed within two years of discovery of the fraud and within five years of each plaintiffs' purchases of securities giving rise to the cause of action.

## SECOND CLAIM

### Violation of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

75. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76. The Individual Defendants acted as controlling persons of Gaia within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

77.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

78.     As set forth above, Gaia and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

79.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

80.     This action was filed within two years of discovery of the fraud and within five years of each plaintiffs' purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: December 20, 2022                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A**.
/s/Phillip Kim
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827


Counsel for Plaintiff