# Exhibit 2

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
**Release No. 11196 / May 23, 2023**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 97548 / May 23, 2023**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-21438**

| | |
|---|---|
| **In the Matter of**<br><br>　　**Gaia, Inc. and**<br>　　**Paul C. Tarell, Jr., CPA**<br><br>**Respondents.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 (the "Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Gaia, Inc. and Paul C. Tarell, Jr. (collectively the "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V as to Respondent Tarell, Respondents consent to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

**<u>Summary</u>**

1.      Gaia overstated the number of paying subscribers for the first quarter of 2019 in an earnings call and a Form 8-K, allowing the company to hit a previously disclosed estimate.  As a subscription-based internet streaming company, the number of paying subscribers is a key metric tracked by industry analysts. On March 4, 2019, Tarell, Gaia's CFO, stated in an earnings call that Gaia expected to have approximately 560,000 subscribers by the end of the first quarter of 2019, an increase of 10,000 subscribers over the prior quarter.  On April 29, Tarell stated in an earnings call that Gaia met its subscriber target and "ended the [first] quarter with 562,000 paying subscribers." Tarell also explained that, due to a transition to a new billing system, the reported number now excluded "subscribers for whom we were unable to successfully charge on our last renewal due to their credit cards becoming invalid . . . ."  Both of these statements were false.  Gaia's reported number of paying subscribers for the first quarter of 2019 included approximately 15,000 subscribers who had been gifted a free month in mid-March 2019, and had neither paid through the end of the month nor reactivated their paying memberships. In addition, Gaia's reported number of paying subscribers for the first quarter of 2019 included the 15,000 non-paying subscribers and approximately 4,500 others that Gaia was unable to successfully charge because their credit cards were declined.

2.      Gaia also violated the anti-retaliation provisions of Section 21F(h) of the Exchange Act when it retaliated against a whistleblower who reported the subscriber count issue both internally to Gaia management and separately to the Commission (the "Whistleblower").  The Whistleblower reported potential wrongdoing internally to Gaia management on at least two occasions.  When Gaia did not fully investigate or remediate the issue, in March 2020, the employee filed a complaint with the Commission and, over the next few months, continued to complain internally to Gaia managers about a range of issues.   Gaia fired the Whistleblower in July 2020, stating, in writing, that Gaia terminated the Whistleblower "for cause" for making "unfounded complaints that required a significant expenditure of company resources to fully investigate."  Those complaints included the whistleblower's complaints about the overstatement of paying subscribers.

3.      Finally, from July 2018 through August 2021, Gaia violated Exchange Act Rule 21F-17 when Gaia included language in 23 employee severance agreements that required employees to waive their rights to receive monetary incentives intended to encourage individuals to communicate directly with the Commission staff about possible securities law violations.

---

[1]  The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

## Respondents

4.      Gaia, Inc. is incorporated in Colorado, with its principal place of business in Louisville, Colorado.  Gaia offers digital video subscription services focusing on yoga, transformation, and alternative healing.  Gaia has been an SEC-reporting company since 2016 as Gaia, Inc. and since 1999 as a predecessor entity called Gaiam, Inc.  Since 2016, Gaia's common stock was registered pursuant to Section 12(b) of the Exchange Act and was listed on the NASDAQ Stock Market, LLC.

5.      Paul C. Tarell, Jr., C.P.A., resides in Boulder, Colorado, and has been Gaia's Chief Financial Officer since July 2016.  Tarell is a certified public accountant licensed in California, but is currently inactive.

## Facts

### Respondents' False Statements in the April 2019 8-K and Earnings Call

6.      As a subscription-based internet streaming company, the number of paying subscribers was a key metric closely tracked by Gaia management and analysts.  In a March 4, 2019 earnings call, Gaia announced its 2018 results for the fourth quarter and year-end, which missed analysts' expectations for, among other things, subscriber growth.  Tarell also explained that Gaia was switching its billing platform, which would have a "one-time impact [on paying subscribers] in the first quarter of 2019."  To temper expectations about Gaia's expected results for the first quarter of 2019, Tarell stated that Gaia "expect[s] to report around 560,000 paying subscribers for Q1," a quarterly growth of approximately 10,000 subscribers.  The next day Gaia's stock dropped approximately 15%.

7.      Gaia relied on billing software to generate the data needed to report paying subscribers in earnings calls.  During the first quarter of 2019, Gaia replaced its legacy home-grown billing software with a third party system.  The migration to the new software was plagued with technical issues that created confusion among Gaia employees, including Tarell, regarding the number of paying subscribers.  Among other things, it appeared to Gaia and Tarell, based on historical subscriber attrition rates, that the transition had caused the company to lose subscribers who otherwise may have maintained their subscriptions.

8.      In early March 2019, in an effort to retain a portion of those subscribers, and based on input from the team managing the software migration, Tarell suggested that Gaia gift a free month to subscribers whose credit cards had been declined on the last attempt, and invite those subscribers to update their payment information.  Gaia's management team approved the plan, and on March 15, Gaia sent an email to almost 20,000 former subscribers whose credit cards were declined on the last attempt, informing those individuals that they had been granted a free month of Gaia's services and inviting them to update their payment information.  Of the approximately 20,000 customers who received Gaia's email encouraging them to update their payment information, approximately 4,500 had pre-paid through the end of the month, and 500 former subscribers reactivated their accounts before the end of the month, but approximately 15,000 other

3

people neither pre-paid nor updated their payment information. As a result, approximately 15,000 reactivated subscribers who had not paid for Gaia's service as of March 2019 were included in Gaia's count of paying subscribers for the first quarter of 2019.

9.     On April 29, 2019, Gaia announced its Q1 2019 results in an earnings release and a Form 8-K and reported "562,000 paying subscribers" as of March 31, 2019, consistent with the company's previously announced target of "around 560,000" paying subscribers. In an earnings call on the same day, Tarell stated that, due to the transition to the new billing system, the 562,000 paying subscribers now excluded "subscribers for whom we were unable to successfully charge on our last renewal due to their credit cards becoming invalid… ." Those statements were false. The subscriber number included 15,000 subscribers who received a free month, had not updated their payment information, had not paid through March 2019, and therefore were not paying for Gaia's service as of the end of the quarter. Moreover, the paying subscriber number included the 15,000 non-paying subscribers and approximately 4,500 others whose credit cards were declined on the last attempt. The next day, Gaia's stock increased almost 14%.

10.     While relying on others, Tarell generally oversaw the process to calculate the paying subscriber number using the new billing system and he reviewed and approved the April 29, 2019 earnings release and Form 8-K. Tarell and Gaia should have known that Gaia missed its target of 560,000 paying subscribers by the end of March 31, 2019, that the paying subscriber count was overstated, and that the paying subscriber number included thousands of people whose credit cards were declined on the last attempt.

11.     In June 2019, Gaia issued 484,832 shares of Class A common stock as part of the consideration to acquire a complimentary streaming platform and its intellectual property.

<u>Statutory and Regulatory Framework Protecting Whistleblowers and Other Witnesses in Commission Investigations</u>

12.     The Dodd-Frank Wall Street Reform and Consumer Protection Act, enacted on July 21, 2010, amended the Exchange Act by adding Section 21F, "Whistleblower Incentives and Protection." The Congressional purpose of these provisions was "to encourage whistleblowers to report possible violations of the securities laws by providing financial incentives, prohibiting employment-related retaliation, and providing various confidentiality guarantees." *See* Implementation of the Whistleblower Provisions of Section 21F of the Securities Exchange Act of 1934," Release No. 34-64545, at p. 197 (Aug. 12, 2011) (the "Adopting Release").

13.     Section 21F(h)(1), in relevant part, prohibits an employer from taking retaliatory actions, either directly or indirectly, against a whistleblower who makes a report to the Commission in accordance with the Exchange Act. Under the statute, "[n]o employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower" (i) in providing information to the Commission in accordance with Section 21F(h); or (ii) in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002, the Exchange Act, or any other law, rule or regulation subject to

4

SEC jurisdiction.  Among the applicable SOX provisions is 18 U.S.C. §1514A, which protects, among other things, internal reports to management at publicly-traded companies that relate to an alleged violation of any rule or regulation of the SEC, or any provision of federal law relating to fraud against shareholders.

14.    Rule 240.21F-2 provides anti-retaliation protection to whistleblowers who reasonably believe that the information he or she provides to the Commission relates to a possible violation of the federal securities laws and provides that information in a manner described in Section 21F(h)(1)(A) of the Exchange Act.

15.    In addition, Congress explicitly noted the importance of providing financial incentives to promote whistleblowing to the SEC as it determined that a "critical component of the Whistleblower program is the minimum payout that any individual could look towards in determining whether to take the enormous risk of blowing the whistle in calling attention to fraud." *See The Restoring American Financial Stability Act of 2010*, Committee on Banking, Housing, and Urban Affairs Report (Apr. 30, 2010).

16.    To fulfill this Congressional purpose, the Commission adopted Rule 21F-17, which provides in relevant part that, "[n]o person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation…." Rule 21F-17 became effective on August 12, 2011.

<u>Whistleblower Retaliation</u>

17.    Beginning in August 2019 through February 2020, the Whistleblower raised concerns with Gaia's senior management that Gaia may have overstated its paying subscribers in the 2019 first quarter earnings release.  The Whistleblower reasonably believed that overstatement was a possible violation of the federal securities laws.  Gaia management inquired into the issue and determined the subscriber count was accurate.  The Audit Committee of the Board of Directors later determined that the issue presented no financial reporting issues.  A board member who also served on Gaia's management team thereafter informed the Whistleblower of Gaia's conclusions and that no action would be taken as a result of the complaint.

18.     On March 16, 2020, after learning that Gaia would not take action on the complaint, the Whistleblower filed a complaint with the Commission detailing the possible overstatement of paying subscribers in Gaia's 2019 first quarter earnings release.

19.    Gaia took adverse actions against the Whistleblower after the Whistleblower had filed a complaint with the Commission, including terminating the Whistleblower in July 2020.  In an email to the Whistleblower, Gaia stated that the Whistleblower was terminated "for cause" for making "unfounded complaints that required a significant expenditure of company resources to fully investigate."  Those complaints included the Whistleblower's complaint about the overstated March 31, 2019 subscriber count.

Whistleblower Impeding

20.    Beginning in July 2018, and continuing through August 2021, Gaia entered into 23 severance agreements (the "Severance Agreements") with certain employees who were leaving the company and who were receiving severance or other post-employment consideration from Gaia.  A severance agreement is a contract between an employer and a former employee documenting the rights and responsibilities of both parties incidental to the employee's departure.

21.    The 23 Severance Agreements purported to interfere with a former employee's right to monetary recovery in connection with any charge or compliant filed by the employee or anyone else with any federal governmental administrative agency, including the SEC.  Each agreement contained a provision providing that:

> Nothing in this Section shall be construed or deemed to interfere with any protected right to file a charge or complaint with any applicable federal, state or local governmental administrative agency charged with enforcement of any law, or with any protected right to participate in an investigation or proceeding conducted by such administrative agency. You are however waiving your right to any monetary recovery or other individual relief in connection with any charge or complaint filed by you or anyone else.

22.    By requiring departing employees to forgo any monetary recovery in connection with providing information to the Commission, Gaia removed the critically important financial incentives that are intended to encourage persons to communicate directly with the Commission staff about possible securities law violations.  Restrictions on the ability of employees to accept financial awards for providing information to the Commission, such as those contained in the Severance Agreements, undermine the purpose of Section 21F, which is to "encourage individuals to report to the Commission," and violate Rule 21F-17(a) by impeding individuals from communicating directly with the Commission staff about possible securities law violations. *See Adopting Release*, at 201.

## Violations

23.    As a result of the conduct described above, Gaia violated Sections 17(a)(2) and 17(a)(3) of the Securities Act, which prohibit any person, in the offer or sale of securities, from obtaining money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and from engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser, respectively. Negligence is sufficient to establish violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act.  *Aaron v. SEC*, 446 U.S. 680, 696-97 (1980).

24.    As a result of the conduct described above, Gaia violated Section 13(a) of the Exchange Act and Rules 13a-11 and 12b-20 thereunder, which collectively require every issuer of a security registered pursuant to Section 12 of the Exchange Act to file with the Commission

6

accurate current reports on Form 8-K that contain such further material information as may be necessary to make the required statements made in the reports not misleading.

25.    As a result of the conduct described above, Tarell caused Gaia's violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 13a-11 and 12b-20 thereunder.

26.    As a result of the conduct described above, Gaia violated Section 21F(h) of the Exchange Act, which prohibits an employer from discharging, demoting, suspending, threatening, harassing, directly or indirectly, or in any other manner discriminating against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower in among other things, providing information regarding potential violations of the securities laws to his or her employer or to the Commission, and Rule 21F-17 thereunder, which prohibits any person from taking any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation.

## Respondent Gaia's Remedial Efforts

27.    Respondent Gaia has revised its form severance agreement to eliminate the language quoted in paragraph 21 above and to replace it with the following:

> Nothing in this Section shall be construed or deemed to interfere with any protected right to file a charge or complaint with any applicable federal, state or local governmental administrative agency charged with enforcement of any law, or with any protected right to participate in an investigation or proceeding conducted by such administrative agency, or to recover any award offered by such administrative agency associated with such charge or complaint.

28.    In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by Respondent Gaia and cooperation afforded the Commission staff.

## Undertakings

29.    Respondent Gaia undertakes that, within sixty (60) days of the entry of this Order, it will make reasonable efforts to contact Gaia former employees who signed one of the Severance Agreements referenced in paragraphs 20-21 above, and provide them with an internet link to the Order and a statement that Gaia does not prohibit former employees from accepting a whistleblower award from the Commission pursuant to Section 21F of the Exchange Act.

30.    Respondent Gaia undertakes to certify, in writing, its compliance with the undertaking set forth above. The certification shall identify the undertaking(s), provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondent Gaia agrees to provide such evidence. The certification and supporting material shall be submitted to Mary Brady, Assistant Regional Director, with a

copy of the Office of Chief Counsel to the Enforcement Division, no later than sixty (60) days from the date of completion of the undertakings.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED that**:**

A.      Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent Gaia cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Sections 13(a) and 21F(h) of the Exchange Act and Rules 12b-20, 13a-11, and 21F-17 thereunder.

B      Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent Tarell cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

C.      Respondent Gaia shall comply with the undertakings enumerated in Paragraphs 29 and 30, above.

D.      Respondent Gaia shall pay civil penalties of $2,000,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).

Payment shall be made in the following installments:

(1)      $600,000 within 14 days of the entry of this Order;
(2)      $140,000 within 70 days of the entry of this Order;
(3)      $140,000 within 100 days of the entry of this Order;
(4)      $140,000 within 130 days of the entry of this Order;
(5)      $140,000 within 160 days of the entry of this Order;
(6)      $140,000 within 190 days of the entry of this Order;
(7)      $140,000 within 220 days of the entry of this Order;
(8)      $140,000 within 250 days of the entry of this Order;
(9)      $140,000 within 280 days of the entry of this Order;
(10)     $140,000 within 310 days of the entry of this Order;
(11)     $140,000 within 340 days of the entry of this Order;

Payments shall be applied first to post-order interest, which accrues pursuant to 31 U.S.C. 3717. Prior to making the final payment set forth herein, Respondent Gaia shall contact the staff of the Commission for the amount due.  If Respondent Gaia fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and

payable immediately at the discretion of the staff of the Commission without further application to the Commission.

   E.  Respondent Tarell shall, within 14 days of the entry of this Order, pay a civil money penalty in the amount of $50,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

   F.  Payment must be made in one of the following ways:

     (1)  Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

     (2)  Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

     (3)  Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Respondent's name as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Jason J. Burt, Regional Director, Division of Enforcement, Securities and Exchange Commission, 1961 Stout Street, Ste. 1700, Denver CO, 80294-1961.

   G.  Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, neither of them shall argue that either is entitled to, nor shall either Respondent benefit by, offset or reduction of any award of compensatory damages by the amount of any part of either Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on

behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondent Tarell, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent Tarell under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent Tarell of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.


Vanessa A. Countryman
Secretary

10