**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action Number: 1:22-cv-03267-GPG-STV

DANA ARMBRUSTER, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,

Plaintiffs,

v.

GAIA, INC., JIRKA RYSAVY, and PAUL
TARELL,

Defendants.

**PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiff John L. BeLong and named plaintiff Dana Armbruster (collectively, "Plaintiffs") individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' second amended complaint against defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Gaia, Inc. (collectively "Gaia" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased the securities of Gaia for the time period December 26, 2017 through and including November 7, 2022 (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Gaia produces and sells subscriptions to its web-based content, which consists of yoga and meditation, among other topics.

3.     During the Class Period Gaia, Company founder, Chief Executive Officer

("CEO"), and Chairman Jirka Rysavy, and former Company Chief Financial Officer

("CFO") Paul Tarell misrepresented to investors the Company's subscriber numbers

growth, business prospects, adequacy of internal controls, and concealed an  SEC

investigation which led to the May 23, 2023 SEC Order Instituting Cease-and-Desist

Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the

Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist

Order (the "SEC Order") (attached to the September 19, 2023 Declaration of Phillip Kim,

Exhibit 2 ("Exhibit 2")).

4.     As a streaming Company that largely depends on paying subscribers for its

revenues, subscriber figures are a crucial metric for Defendant Gaia and its investors.

Pertinent to this matter is that after a stock decline following a report of disappointing

subscriber figures for the fourth quarter of 2018, the Company set itself a modest target

for subscriber growth for the subsequent quarter—the first quarter of 2019. However, due

to issues with shifting to a new software system that was used to bill and track subscribers

(the "New Billing System"), it appeared to Defendants Gaia and Tarell, who generally

oversaw and tracked subscriber figures, that the Company actually *lost* nearly 20,000

paying subscribers as a result of the New Billing System. This assessment was based on

an internal review of historical subscriber attrition rates.

5.     In a bid to retain a portion of the nearly 20,000 subscribers who appeared

to have been lost due to the issues with the New Billing System, the Company offered

those 20,000 subscribers a free month of service (as well as inviting them to submit

updated payment information). Of those 20,000, 15,000 former subscribers neither pre-

paid for service nor updated their payment details. Gaia then included those 15,000 *non-paying* individuals as paying subscribers in its subscriber count for the first quarter of 2019, which allowed it to hit the modest subscriber growth target it had set itself during the previous quarter. On this news, Gaia stock went *up* 14%. Afterwards, an employee who knew the reported figure of paying subscribers was false raised the issue over a few months internally with the Company, but was systematically ignored or worse, and then brought the matter to the SEC's attention. After the report to the SEC, the Company retaliated against that employee by terminating the whistleblower for cause for raising legitimate concerns about the subscriber figure. The Company also engaged in other anti-whistleblower activity at various times during the Class Period.

6.     As a result of these actions and adverse information, Plaintiffs and the class were damaged.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

10.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of

interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.     Plaintiffs purchased Gaia common stock during the Class Period. Their PSLRA certifications were previously filed with the Court and are incorporated by reference. *See* Dkt. Nos. 1-1, 15-2.

12.     Defendant Gaia is a Colorado corporation with its principal executive offices located at 833 West South Boulder Road, Louisville, Colorado 80027. At all relevant times herein, Gaia's common stock was listed on the NASDAQ Stock Exchange (the "NASDAQ"). From the beginning of the Class Period to the present time, the Company was known as Gaia, Inc. and its common stock was listed under ticker symbol "GAIA."

13.     Gaia purports to be a ***"Member-supported global video streaming service and community"*** that produces and curates conscious media through four primary channels—Seeking Truth, Transformation, Alternative Healing and Yoga—in four languages (English, Spanish, French and German) to its members in 185 countries. Gaia's library includes over 10,000 titles, 80% of which is exclusive to Gaia, and approximately 75% of viewership is generated by content produced or owned by Gaia."

(Emphasis added).

14.     Gaia was formerly known as Gaiam, Inc. and was a preeminent yoga-lifestyle brand. Defendant Rysavy founded it in the late 1980's, helping to popularize the ancient Indian practice in the United States. Gaiam began developing a streaming service around 2009, and the yoga business, and was ultimately spun-off in 2016. After this spin-

off, Gaia became primarily a streaming company, similar to Netflix, which primarily depends on subscriber payments for its revenues.

15.     As the Company stated in its latest Annual Report dated March 6, 2023, its "revenues are primarily from subscription fees for services related to streaming content of our members." The Company additionally disclosed that it had "reported net losses during several prior years as a result of continued investment in member acquisition efforts to drive revenue growth." As a result, subscriber figures and subscriber growth are a key metric for Gaia and its investors.

16.     Defendant Jirka Rysavy ("Rysavy"), the Company's founder, was at all relevant times herein was the Company's CEO, and Chairman.

17.     Defendant Paul Tarell ("Tarell") at all relevant times herein was the Company's CFO. Subsequent to the SEC Order, on June 22, 2023, the Company announced that Tarell had resigned as CFO, effective on June 26, 2023.

18.     Defendants Rysavy and Tarell are collectively referred to herein as the "Individual Defendants."

19.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

20.     Gaia is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

21.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

22.     Gaia and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### BACKGROUND

23.     On November 6, 2017, Gaia disseminated a press release announcing its results for the third quarter of 2017, which was filed the same day with the SEC on Form 8-K. In this release, the Company purported to have achieved a paying subscriber count

of 311,000 on September 30, 2017, up from 180,000 one year prior, and a 73% subscriber growth rate from 46% in the third quarter of 2016.

24.    On November 7, 2017, the Company filed with the SEC its quarterly report for the period ended September 30, 2017 (the "3Q17 Report"). Attached to the 3Q17 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Rysavy and Tarell attesting to the accuracy and truthfulness of the information contained therein.

25.    The 3Q17 Report did not reveal any internal control weaknesses. Instead, it stated, in pertinent part:

> "Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of September 30, 2017, **our management has concluded that those disclosure controls and procedures are effective**."

(Emphasis added).

26.    The Class Period begins on December 26, 2017, as the statements made in the November 6, 2017 press release and the 3Q17 Report were still live through that date.

27.    On February 27, 2018, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2017 (the "2017 Annual Report"). Attached to the 2017 Annual Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

pg 9 of 49

28.    The 2017 Annual Report did not reveal any internal control weaknesses. Instead, it stated, in relevant part:

> Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended. Based upon their evaluation as of December 31, 2017, **our management has concluded that those disclosure controls and procedures are effective**.
>
> (Emphasis added).

29.    On May 7, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2018 (the "1Q18 Report"). Attached to the 1Q18 Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

30.    The 1Q18 Report did not reveal any internal control weaknesses. Instead, it stated, in relevant part:

> Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of March 31, 2018, **our management has concluded that those disclosure controls and procedures are effective**.
>
> (Emphasis added).

31.    On August 6, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2018 (the "2Q18 Report"). Attached to the 2Q18 Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal control over financial reporting and the disclosure of all fraud.

32.    The 2Q18 Report did not reveal any internal control weaknesses. Instead, it stated, in relevant part:

> ***Our management, with the participation of our Chief Executive Officer and Chief Financial Officer***, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of June 30, 2019, ***our management has concluded that those disclosure controls and procedures are effective***.

(Emphasis added).

33.    This statement was false at the time it was made because, as per the SEC Order, starting in July 2018, Gaia violated Exchange Act Rule 21F-17 when it included language in employee severance agreements which required employees to waive their rights to receive monetary incentives which are intended to encourage individuals to communicate directly with the Commission staff about possible securities law violations.

34.    On November 6, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2018 (the "3Q18 Report"). Attached to the 3Q18 Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

35.    The 3Q18 Report did not reveal any internal control weaknesses. Instead, it stated, in relevant part:

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934.

> Based upon its evaluation as of September 30, 2018, **our management has concluded that those disclosure controls and procedures are effective**.

(Emphasis added).

36.      This statement was false at the time it was made because, as per the SEC Order, starting in July 2018, Gaia violated Exchange Act Rule 21F-17 when it included language in employee severance agreements which required employees to waive their rights to receive monetary incentives which are intended to encourage individuals to communicate directly with the Commission staff about possible securities law violations.

37.      On December 17, 2018, during trading hours, an article was posted by the author "Wall Street for Main Street" on *Seeking Alpha* entitled "Gaia: Substantial Downside Remains." In pertinent part, the article stated the following:

> **We think there are a lot of holes in Gaia's own growth estimates and its 26 million subscriber target for which no date is given in its investor presentation**. They start off with a number of 546 million global video service subscriptions by 2022. Then they narrow it down to 377 million which are supposedly people willing to pay for a subscription who are also interested in at least one Gaia topic. One should note that the 377 million numbers come from Gaia's own segmentation and market size study which is not described anywhere we could find. Finally, they take what might appear to be a fairly low portion of this number, seven percent or 26 million subscribers, as their target. Their more near term target is 1.5 million subscribers in 2021.
>
> **This growth target is likely to prove unachievable as the competition already covers some of the same topics as Gaia**. Yoga is one of the main video topics Gaia offers. Netflix (NFLX) and Amazon Prime (AMZN) already offer yoga and other workout videos as part of their streaming service. **If either of these giants saw that there was more demand to fill in this area from their subscribers, they could surely expand on their content accordingly**. **Obviously, there are also plenty of yoga and other exercise videos available at no cost at all to anyone with internet access on Google's YouTube and various other sites**.
>
> In its investor presentation, Gaia notes that 72% of Gaia subscribers also have a Netflix subscription. They go on to state that 50% of U.S. streaming video on demand households already has two or more services. **We don't see the majority of consumers wanting to continuously pay for multiple video streaming subscription services. This leads us to believe that Gaia is likely going to**

***have much higher churn rates than Netflix***. Therefore, in order to maintain subscription growth, Gaia will see increases in customer acquisition costs or at least have trouble reducing these costs leading to much lower margins going forward than anticipated.

(Emphasis added).

38.     On this news (¶ 37), the price of GAIA stock declined by $0.45 per share from the opening price, or 4.1%, to close at $10.50 per share on December 17, 2018. This decline was a $0.50 drop from the prior trading day's close of $11.00, or 5%.

39.     On March 4, 2019, after market hours, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 Annual Report"). Attached to the 2018 Annual Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

40.     The 2018 Annual Report did not reveal any internal control weaknesses. Instead, it stated, in relevant part:

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended. Based upon their evaluation as of December 31, 2018, ***our management has concluded that those disclosure controls and procedures are effective***.

(Emphasis added).

41.     This statement was false at the time it was made because, as per the SEC Order, starting in July 2018, Gaia violated Exchange Act Rule 21F-17 when it included language in employee severance agreements which required employees to waive their rights to receive monetary incentives which are intended to encourage individuals to communicate directly with the Commission staff about possible securities law violations.

42.     On the corresponding earnings call on March 4, 2019, after market hours, Defendant Rysavy misrepresented the Company's practices with counting subscribers by not disclosing that, in addition to counting those with payment issues as subscribers, the Company would include those who were accessing Gaia content for free. Defendant Rysavy stated, in pertinent part:

> During 2019, transitioned our legacy internally developed billing and subscription management platform to an enterprise level solution. This allows us to expand our pricing options and support additional international and other payment methods with minimal incremental development effort. Through this transition, we have gained additional reporting capabilities around our recurring billing processes, allowing us to reevaluate the criteria we use to determine who we consider a paying subscriber, primarily around payment related issues.
>
> ***Historically, we provided for a 15-day grace period and included all subscribers with card related payment issues in our member count at period end.*** With the new system, we are better able to determine the rate at which we will resolve these issues at an individual subscriber level and will therefore only include a subset of this group on each balance sheet date going forward. This will have a one-time impact in the first quarter of 2019.
>
> (Emphasis added).

43.     In this same earnings call, Gaia disclosed results that missed expectations for, among other things, subscriber growth. To manage expectations around expected results for the first quarter of 2019, Defendant Tarell stated the following:

> While we expect to add about the same number of net subscribers in the first quarter as we did in the fourth quarter, with the impact of our refined subscriber definitions and the discontinuation of our spiritual cinema DVD club, ***we expect to report around 560,000 subscribers for Q1***. We will provide adjusted historical member count numbers reflecting the disposal of the spiritual cinema club with our Q1 release.
>
> (Emphasis added).

44.     On this news (¶ 43), Gaia stock declined by $1.76 per share, or 15%, to close at $9.64 per share on March 5, 2019, on unusually high trading volume. The next

day, the stock declined a further $0.83 per share, or 9%, to close at $8.81 on March 6, 2019.

45.     As indicated above in ¶ 42 by Defendant Rysavy, Gaia relied on billing software to generate data on reported paying subscribers, which it then reported in earnings calls. During the first quarter of 2019, Gaia switched from its legacy billing software to the New Billing System. The transition to the New Billing System was not smooth—the New Billing System had technical issues which created confusion among Gaia's employees, including Tarell (who generally oversaw the process to calculate the paying subscriber number), regarding the true number of paying subscribers. As such, the above statement in ¶ 42 was false to the extent that it extolled the benefits of the New Billing System while failing to disclose that the New Billing System was fraught with issues.

46.     The transition to the New Billing System was executed so poorly that it reportedly caused the Company to lose subscribers who otherwise might have maintained their subscriptions.

47.     In an effort to retain a portion of those lost subscribers, in early March 2019, Defendant Tarell suggested that Gaia give a free month of access to subscribers who had had their credit cards declined on the last renewal attempt, and invite them to update their payment information. This plan was approved, and on March 15, 2019, Gaia sent an email to almost 20,000 former subscribers whose credit cards had been declined on the last attempt.

48.     Of these nearly 20,000 customers, 4,500 had pre-paid through the end of the month, 500 former subscribers reactivated their accounts before the end of the

month, but 15,000 reactivated subscribers who had not paid for a Gaia subscription as
of March 2019 were included in the paying subscriber count for the first quarter of 2019.

49.     On April 29, 2019, after the market had closed, the Company issued a press
release falsely announcing "34% subscriber growth" for 1Q19, an increase to 562,000
paying subscribers from 418,200 on March 31, 2018. Without reporting this false paying
subscriber figure, the Company would not have met its previously announced target
(from March 4, 2019) of "around 560,000" paying subscribers for the first quarter of 2019.
The Company reported that this subscriber growth led to a 36% increase in revenues.

50.     That same day, the Company filed with the SEC its quarterly results on
Form 10-Q with the SEC for the period ended March 31, 2019 (the "1Q19 Report"). The
1Q19 Report was signed and separately certified by both Defendants Rysavy and Tarell
pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any
material changes to the Company's internal control over financial reporting and the
disclosure of all fraud.

51.     The 1Q19 Report did not reveal any internal control weaknesses. Instead,
it stated, in relevant part:

> "Our management, **with the participation of our Chief Executive Officer and
> Chief Financial Officer, conducted an evaluation of the effectiveness of the
> design and operation of our disclosure controls and procedures**, as defined
> in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange
> Act of 1934. Based upon its evaluation as of March 31, 2019, **our management
> has concluded that those disclosure controls and procedures are effective**."

(Emphasis added).

52.     This statement was false at the time it was made because, as per the SEC
Order, the Company reported a materially false subscriber figure for 1Q19. The Company
stated that this false subscriber figure caused 34% revenue growth. In addition, the

Company was at a heightened undisclosed risk of reporting a false subscriber figure as a result of issues with the New Billing System.

53.    Further, starting in July 2018, Gaia violated Exchange Act Rule 21F-17 when it included language in employee severance agreements which required employees to waive their rights to receive monetary incentives which are intended to encourage individuals to communicate directly with the Commission staff about possible securities law violations.

54.    On the Company's April 29, 2019 (at 4:30 PM) earnings call to discuss its financial results for 1Q19, Defendant Rysavy stated, in pertinent part:

> We finished the first quarter with 562,000 subscribers, **which is a 34% increase from 418,200 which we had a year ago**. We increased the target minimum ratio between the subscribers lifetime value and the cost to acquire subscriber from 2:1 which we targeted last two years to 3:1. During the first quarter, our acquisition costs decreased to $80 per customer. And as a percentage of revenue, cost of acquisition declined to 68% from 109% in the year-ago quarter.
>
> We are now focused on increasing our LTV CPA ratio [Customer Lifetime Value to Cost Per Acquisition] target to 3.5:1 by end of September and transitioning to positive EBITDA by the same time, maintaining revenue growth rate above 30% going forward with a steady gross margin.
>
> In January we increased our monthly subscription price for new members by 20% to $11.99, while grandfathering our existing numbers on for the first renewal in 2020. Our renewal subscription price remained at $99. Last week we commenced marketing our new lifetime annual membership at $299, is the announcement of initial speaker lineup. The first live event will take place in June and second in August. This annual membership also includes our existing online offering.

(Emphasis added).

55.    On the same call, in pertinent part, Defendant Tarell stated the following:

> Revenues in the first quarter increased 36% to $12.5 million, compared to the year ago quarter **due to subscriber growth over the same period of approximately 34%. We ended the quarter with 562,000 paying subscribers, which reflects the discontinuation of the DVD club, as well as the exclusion of subscribers for whom we were unable to successfully charge on our last renewal due to their credit cards becoming invalid**. Which, as mentioned on our last call, with

our new billing system we implemented in the first quarter, we were able to find the classification of active subscribers to exclude subscribers that are at payment declines status. As previously noted, this was a onetime adjustment.

(Emphasis added).

56.    Defendants Rysavy and Tarell's comments on subscriber figures were materially false and misleading because the Company had extended a month of free service to nearly 20,000 subscribers, of which approximately 15,000 had not paid for access to the Company's content, but were nonetheless counted as paying subscribers.

57.    On this news (¶¶ 54-56), which was material to investors, the price of Gaia stock went up $1.29 per share, or 14%, to close at $10.58 on April 30, 2019.

58.    On August 6, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2019 (the "2Q19 Report"). Attached to the 2Q19 Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

59.    The 2Q19 Report did not reveal any internal control weaknesses. Instead, it stated, in relevant part:

> "Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures**, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of June 30, 2020, **our management has concluded that those disclosure controls and procedures are effective**."
>
> (Emphasis added).

60.    This statement was false at the time it was made because, as per the SEC Order, starting in July 2018, Gaia violated Exchange Act Rule 21F-17 when it included language in employee severance agreements which required employees to waive their

rights to receive monetary incentives which are intended to encourage individuals to communicate directly with the Commission staff about possible securities law violations.

61.     Further, as per the SEC Order, starting in August 2019, a whistleblower (the "Whistleblower") began to raise concerns with Gaia's senior management on the issue of whether Gaia had overstated the number of paying subscribers for the first quarter of 2019. In response to these valid concerns, Gaia's management inquired into the issue and incorrectly reported that the subscriber count was accurate. The Audit Committee of the Board of Directors incorrectly determined at a later time that the issue presented no financial reporting issues. A board member who also served on Gaia's management  team thereafter informed the Whistleblower of Gaia's conclusions, and stated that no action would be taken.

62.     Further, the statement was materially false and misleading because, due to known issues with the New Billing System, the Company was at an undisclosed heightened risk of reporting false subscriber figures to its investors (which, in turn, led to a risk of a false report on revenue growth), which it had done in the 1Q19 Report.

63.     One particular motive for the false statement regarding the subscriber figure, in order to prop up the value of the stock, soon became apparent. The Company reported the following in its 2Q19 Report:

> In June 2019, we issued 404,891 shares of Class A common stock as part of the consideration for an acquisition of a complementary streaming platform focused on Alternative Healing. If the acquired platform maintains profitability and achieves a specific subscriber growth threshold as of June 30, 2020, we may issue up to 208,589 additional shares of Class A common stock as additional consideration. We also issued 79,941 shares of Class A common stock as part of the consideration to acquire over 450 titles of original content that will be integrated into our Alternative Healing channel.

64.     On September 23, 2019, after market hours, an article was posted by the author "The Insiders Forum" on *Seeking Alpha* entitled "Gaia's Inflection Point." In pertinent part, the article discussed the financially difficult steps the Company has taken to achieve subscriber growth, and also discussed how the subscriber growth rate was likely to fall:

> As the company pivoted to a streaming video subscription service model in 2012, its primary aim was to be the dominant provider of New Age content, eventually setting targets of 1 million subscribers by YE19 and 1.5 million by YE21. Although it will not achieve those lofty objectives, Gaia has still been successful, growing subscribers at a 62% CAGR from YE15 (128,200) to YE18 (547,500). Revenues in the same period grew at a 60% CAGR to $47.6 million. USA Today ranked Gaia as the world's fastest growing retailer in May 2019. It would not be stretching credulity to say that Gaia has a substantial lead – near monopolistic – position in streaming New Age content.
>
> ***To accomplish those ends, the company needed to expend significant capital to capture subscribers and build an online brand***. That capital was raised through the divestiture of its legacy (Gaiam) branded segment, which included the sale of its 51.4% interest in Natural Habitat for $12.8 million and its branded consumer products division for gross consideration of $167 million. Approximately $81 million of the proceeds were spent on the repurchase of 9.6 million shares and 840,000 vested stock options through a tender offer conducted at $7.75 a share. All of these transactions occurred in 2016. The balance went to fund the growth of its subscriber base.
>
> ***The cost to reel in new users has been steep***. Customer acquisition costs (CAC) were 98% of revenue in FY17 and 110% in FY18. Non-CAC operating expenses were also steep, running 86% and 64% of revenue in FY17 and FY18, respectively. These significant outlays led to EBITDA losses of $18.8 million and $31.7 million and GAAP EPS losses of $1.54 and $1.96 in 2017 and 2018, both respectively. Gaia had to raise net proceeds of $31.7 million at $15 per share in March 2018 and fully tap its credit facility for $12.5 million to keep up with the customer acquisition outflow.
>
> "On August 5, 2019, the company reported a 2Q19 loss of $0.25 a share (GAAP) on revenue of $13.2 million versus a loss of $0.36 (GAAP) on revenue of $10.0 million. These metrics beat the Street consensus by $0.08 and were in line, respectively. Subscribers grew 26% YoY from 463,200 to 582,200 as CAC decreased from 85% of revenue in 2Q18 to 57% in 2Q19. The drop in CAC as a percentage of revenue is even more pronounced when measured against 3Q18 (125%) and 4Q18 (120%). More notably, EBITDA for 2Q19 was -$1.6 million, or -

12% of revenue, up from -75% at YE18. Management reiterated its goal of achieving positive EBITDA by the end of September 2019 with subscribers at 590,000 to 600,000 and expects free cash flow generation in 2H20. ***Taken as a whole, the company is on a trajectory towards profitability, albeit at a lower rate of subscriber growth***."

*        *        *

I am on the fence on this name. If they can achieve 30% growth going forward, shares should rebound. My guess is that the price increase will stick without too much drop off. ***If you are really into New Age (which I am at a disadvantage at since this does not apply to me), Gaia is the place to go, but subscriber growth is likely to continue to slow I think to 10-15%.***

(Emphasis added).

65.    On this news (¶ 64), the price of GAIA stock declined as much as $0.685 in intraday trading, or 9.3%, before closing at $6.79 per share on September 24, 2019, a 7.36% decline from the previous closing price of $7.33.

66.    On November 5, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2019 (the "3Q19 Report"). Attached to the 3Q19 Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

67.    The 3Q19 Report did not reveal any internal control weaknesses. Instead, it  stated, in relevant part:

"Our management, ***with the participation of our Chief Executive Officer and Chief Financial Officer,*** conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of September 30, 2019, ***our management has concluded that those disclosure controls and procedures are effective***."

(Emphasis added.)

68.    This statement was false at the time it was made because, as per the SEC
Order, starting in July 2018, Gaia violated Exchange Act Rule 21F-17 when it included
language in employee severance agreements which required employees to waive their
rights to receive monetary incentives which are intended to encourage individuals to
communicate directly with the Commission staff about possible securities law violations.
In addition, as previously discussed, the Whistleblower was raising concerns regarding
the false subscriber figures reported for the first quarter of 2019 during this period, which
the Company consciously disregarded.

69.    Further, the statement was materially false and misleading because, due
to known issues with the New Billing System, the Company was at an undisclosed
heightened risk of reporting false subscriber figures to its investors (which, in turn, led to
a risk of a false report on revenue growth), which it had done in the 1Q19 Report.

70.    On the Company's corresponding 3Q19 earnings call, Defendant Tarell
announced that the Company was returning to a free trial period:

> ***Effective October 15, 2019, we have returned to a two-week free trial and
> eliminated the $0.99 charge. This is consistent with the pricing model from
> those content subscription services and brings us in line with consumer
> expectations***. This will not meaningfully impact revenues, but will impact the
> reported member count for the fourth quarter, as we will not be including trials in
> the member base going forward.
> Even with our counting trial members, we expect to end the year around 600,000
> paying members. For comparison purposes, we had approximately 38,000
> members in the $0.99 trial period at December 31, 2018.

(Emphasis added).

71.    This statement was materially false and misleading because he did not
announce that the Company had, earlier that year, returned to a free trial period as a
result of the issues with the New Billing System, which resulted in the Company reporting

thousands of non-paying subscribers as paying subscribers, artificially raised the number of subscribers.

72.     On December 18, 2019, during trading hours, an article was posted by the author "Reformer Capital" on *Seeking Alpha* entitled "Gaia Inc.: Downward Dog – Failed Spin-Offs And Newly Uncovered Information Highlights Potentially Higher Subscriber Churn, 70% Downside." (the "Reformer Capital Article") In pertinent part, the Reformer Capital Article stated, "***we see evidence of widespread difficulty in subscribers being able to cancel their accounts, potentially indicating that subscription figures are inflated***." Reformer Capital's opinion was purportedly based on "***reviews in forums such as Better Business Bureau and Trustpilot, [where we] found a significant number of complaints regarding GAIA's cancellation system and billing***. ***Many customers who sign up for a free trial or normal subscription eventually have trouble cancelling and are incorrectly billed. Numerous consumers complain about the inability to cancel their service, or contact customer service once they find incorrect billing issues***." (Emphases added).

73.     Further, the Reformer Capital Article quoted a November 13, 2019 consumer complaint captioned "FRAUD" which stated:

> Only got to watch one video and decided to cancel after my trial. I canceled my subscription but they still charged me, I assumed I did it wrong so I canceled again and took the payment as it was my fault. Eventually I figured out it STILL didn't work so I contacted their support, which is BS, took them forever to reply and they replied with how to cancel I informed them I did that twice. Then I received no reply after that. So I tried to cancel again! Still it was. charging me! Attempted to reach out AGAIN and nothing, I eventually had to report them for FRAUD to my bank and get a new debit card! RIDICULOUS! So I give them a one star for being so MONEY HUNGRY and ignoring my many attempts to make it right!

74.    Reformer Capital attached to its Article a file with over 70 "similar complaints from consumers unhappy with GAIA's billing and cancellation system."

75.    On this news (¶¶ 72-74), the price of GAIA stock declined as much as 2.89% in intraday trading before closing down $0.11 per share, or 1.27%, from the prior day's closing price to close at $8.52 on December 18, 2019.

76.    On February 24, 2020, the Company filed with the SEC its 2019 annual report on Form 10-K for the year ended December 31, 2019 (the "2019 Annual Report"). Attached to the 2019 Annual Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

77.    The 2019 Annual Report did not reveal any internal control weaknesses. Instead, it stated, in relevant part:

> "Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended. Based upon their evaluation as of December 31, 2019, **our management has concluded that those disclosure controls and procedures are effective**."

(Emphasis added.)

78.    This statement was false at the time when it was made because, as per the SEC Order, starting in July 2018, Gaia violated Exchange Act Rule 21F-17 when it included language in employee severance agreements which required employees to waive their rights to receive monetary incentives which are intended to encourage individuals to communicate directly with the Commission staff about possible securities law violations. In addition, as previously discussed, the Whistleblower was raising

concerns regarding the false subscriber figures reported for the first quarter of 2019 during this period, which the Company consciously disregarded.

79.     Further, the statement was materially false and misleading because, due to known issues with the New Billing System, the Company was at an undisclosed heightened risk of reporting false subscriber figures to its investors (which, in turn, led to a risk of a false report on revenue growth), which it had done in the 1Q19 Report.

80.     In the corresponding February 24, 2020 earnings call, Defendant Rysavy stated that the Company had reinstated a period of free subscription service in Q4 of the 2019 Fiscal Year. Defendant Rysavy stated, in relevant part, as follows:

> Thank you, and good afternoon, everyone. So revenue increased 24% to $14.7 million for the fourth quarter and 29% to $54 million for the year. ***In fourth quarter, we eliminated the $0.99 trial from our pricing plans and replaced it with the free trial***. We ended the quarter with 599,000 subscribers. This is with our own counting as we did historically, a change from what we did historically. There are members, which were at $0.99 trial, which before we considered members, of which we had to about 37,000 at December 31, 2018.

> (Emphasis added).

81.     This statement was materially false and misleading because the Company had extended free subscription services to certain users in 1Q19 (far earlier than acknowledged), but counted those with free access as paying subscribers. Further, the Company had done so as a result of the issues with the New Billing System, which was still undisclosed.

82.     On the same earnings call, Defendant Tarell stated that because the Company had eliminated a $0.99 introductory trial period, that the Company was no longer including trial members as paid members. Defendant Tarell stated, in pertinent part, the following:

As we discussed on the Q3 call, we eliminated the $0.99 introductory trial period in October and are now offering a 1-week free trial for potential new members who're selecting there the monthly or annual billing plans.
***We are, therefore, no longer including the trial members in reported member count until they convert to paid members***.

(Emphasis added).

83.     This statement was materially false and misleading because it omitted that the Company had offered free access during the first quarter of 2019 as a result of the issues with the New Billing System, and that it had counted 15,000 individuals who were not paying to use the platform as paid subscribers.

84.     On April 27, 2020, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2020 (the "1Q20 Report"). Attached to the 1Q20 Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

85.     The 1Q20 Report did not reveal any internal control weaknesses. Instead, it stated, in relevant part:

"Our management, ***with the participation of our Chief Executive Officer and Chief Financial Officer***, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of March 31, 2020, ***our management has concluded that those disclosure controls and procedures are effective***."

(Emphasis added.)

86.      This statement was false at the time it was made because, as per the SEC Order, starting in July 2018, Gaia violated Exchange Act Rule 21F-17 when it included language in employee severance agreements which required employees to waive their

rights to receive monetary incentives which are intended to encourage individuals to communicate directly with the Commission staff about possible securities law violations. In addition, as previously discussed, the Whistleblower was raising concerns regarding the false subscriber figures reported for the first quarter of 2019 through February 2020, which the Company consciously disregarded.

87.    On March 16, 2020, after learning that the Company would not act regarding the valid concerns over the false subscriber figures given to the investing public for the 1Q19, the Whistleblower filed a complaint with the SEC detailing the possible overstatement of paying subscribers in the Company's 1Q19 Earnings Release.

88.    Further, the statement was materially false and misleading because, due to known issues with the New Billing System, the Company was at an undisclosed heightened risk of reporting false subscriber figures to its investors (which, in turn, led to a risk of a false report on revenue growth), which it had done in the 1Q19 Report.

89.    On August 3, 2020, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended June 3, 2020 (the "2Q20 Report"). Attached to the 2Q20 Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

90.    The 2Q20 Report did not reveal any internal controls weaknesses. Instead, it  stated, in relevant part:

> "Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of June 30, 2020, **our management has concluded that those disclosure controls and procedures are effective**."

(Emphasis added.)

91.     This statement was false at the time it was made because, as per the SEC Order, starting in July 2018, Gaia violated Exchange Act Rule 21F-17 when it included language in employee severance agreements which required employees to waive their rights to receive monetary incentives which are intended to encourage individuals to communicate directly with the Commission staff about possible securities law violations.

92.     In addition, by the time the 2Q20 Report was filed with the SEC, the Company retaliated against the Whistleblower. Specifically, in an email to the Whistleblower, Gaia stated that the Whistleblower was terminated "for cause" for making "unfounded complaints that required a significant expenditure of company resources to fully investigate", which included the Whistleblower's complaint about the overstated 1Q19 subscriber count.

93.     Further, the statement was materially false and misleading because, due to known issues with the New Billing System, the Company was at an undisclosed heightened risk of reporting false subscriber figures to its investors (which, in turn, led to a risk of a false report on revenue growth), which it had done in the 1Q19 Report.

94.      On November 9, 2020, the Company with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2020 (the "3Q20 Report"). Attached to the 3Q20 Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

95.    The 3Q20 Report did not reveal any internal controls weaknesses. Instead,

it stated, in relevant part:

> "Our management, **with the participation of our Chief Executive Officer and
> Chief Financial Officer**, conducted an evaluation of the effectiveness of the
> design and operation of our disclosure controls and procedures, as defined in Rule
> 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of
> 1934. Based upon its evaluations as of September 30, 2020, **our management
> has concluded that those disclosure controls and procedures are effective**."
> (Emphasis added.)

96.    This statement was false because, starting in July 2018, Gaia violated

Exchange Act Rule 21F-17 when it included language in employee severance

agreements which required employees to waive their rights to receive monetary

incentives which are intended to encourage individuals to communicate directly with the

Commission staff about possible securities law violations. Also, by this time, the Company

had even retaliated against the Whistleblower for raising legitimate concerns about issues

such as reporting false subscriber figures to the investing public.

97.    Further, the statement was materially false and misleading because, due to

known issues with the New Billing System, the Company was at an undisclosed

heightened risk of reporting false subscriber figures to its investors (which, in turn, led to

a risk of a false report on revenue growth), which it had done in the 1Q19 Report.

98.    On the corresponding November 9, 2020 earnings call, in response to an

analyst question on subscribers, Defendant Tarell misrepresented the Company's

strategy, stating, in pertinent part, the following:

> Question: "First for me on the annual subscription plan, what do you think are some
> of the key drivers that allow you to uphold that 20% to 30% mix? And has this
> started to translate into an increase in retention and higher lifetime value so far?
>
> Answer: "***The biggest shift is in what we did back in Q4 of last year when we
> actually put the trial period on both the monthly and the annual plan. That's***

*what drove the biggest move in that direction*. And as we've continued to tweak and optimize our cart and checkout flow, we've added some things to help highlight the value of the annual plan. And I believe that's really the primary factor of it, is the people that believe that they're committed to Gaia can look at it from a financial perspective and see the value that they get versus the monthly membership. And of course, it is improving retention because we only need to look at once a year renewals versus 12 monthly renewals for the same group of people. versus 12 monthly renewals for the same group of people. But it is a direct drag on ARPU, obviously.

(Emphasis added).

99.    This statement misrepresented the Company's financial results because the Company had allowed free access to the Company's content to certain users prior to, as Defendant Tarell stated, Q4 of 2019. Further, the Company had incorrectly counted users who were accessing the content for free as paid subscribers. The statement was also false because it did not reveal that the Company had allowed free access as a result of issues with the New Billing System.

100.    On November 18, 2020, during trading hours, an article by the author "Pacifica Yield" entitled "Gaia: Searching for Inner Alpha" was posted on *Seeking Alpha*. The article emphasized the highly niche nature of Gaia's content, which calls into question the serviceable market around its content, and how many subscribers it can reasonably hope to add. The article stated, in pertinent part, the following:

[. . .] [w]ith shares currently trading at $11.65, the company's total market capitalization of $223 million places its TTM revenue multiple at 3.54. While this might seem somewhat low for a streaming company *the pricing reflects the risk of its incredibly alternative content which I described as "weird" in my last article. To state that the market for such content was niche would be a significant understatement*. Hence, comparisons to Netflix by some bullish commentary seems misplaced.

While both are streaming platforms which charge a monthly fee to their subscribers to gain access to their content, *Gaia's documentaries, films, and TV-style series focus on new age spirituality, conspiracy theories, alternative*

***medicine, astrology, and history. It is hard not to conclude that both Gaia
and its viewers exist in a type of mental upside down***.

\*          \*          \*

***While Gaia has been able to drastically improve its fundamentals over the
last few quarters, the extent to which this will continue in the coming
quarters is in doubt***. In the short to medium term the stock might move higher on
the back of improving financials. In the longer term, Gaia's future likely remains
clouded in the very mystery it explores.

(Emphasis added).

101.    On this news (¶ 100), the price of Gaia stock fell from an opening price of

$11.66 per share (after closing at $11.63 the prior day) to as low as $10.95 in intraday

trading, or 6.08%, before closing on November 18, 2020 at $11.06, down 5.14% from the

opening price.

102.    On Sunday, February 14, 2021, *Business Insider* released an article called

"Gaia ***was*** a wildly popular yoga brand. ***Now it's a publicly traded Netflix rival*** pushing

conspiracy theories while employees fear the CEO is invading their dreams," revealing

internal and management control weaknesses—particularly the domineering and

controlling nature of Defendants  Rysavy and Tarell and the poor tone at the top within

the Company. (Emphasis added).

103.    On February 17, 2021, before the market opened, *Business Insider*

published a follow up article on February 17, 2021, called "Gaiam, one of the world's most

popular yoga mats, has its roots in a conspiracy site that touts alien secrets and 9/11

theories"—raising further doubts about the legitimacy of management controls within the

company. The article stated, in pertinent part, "***[f]reed of the Yoga business,*** Gaia

leaned harder into its alternative beliefs, and rumours and conspiracy theories spread

inside its workplace. Some panicked workers have speculated that the CEO is using

supernatural means to invade their dreams, and that they're being manipulated by crystal energies, sources told Insider." (Emphasis added).

104.    On this news (¶¶ 102-103), the price of Gaia stock fell from a closing price of $9.82 per share on February 12, 2021 to a low of $9.49 in intraday trading, or 3.36%, before hitting a closing price of $9.62 per share on February 17, 2021, a 2.03% decline.

105.    On March 2, 2021, the Company filed with the SEC its 2020 Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Annual Report"). Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

106.    The 2020 Annual Report did not reveal any internal control weaknesses. Instead, it stated, in relevant part:

> "Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended. Based upon their evaluation as of December 31, 2020, **our management has concluded that those disclosure controls and procedures are effective**."

(Emphasis added.)

107.    This statement was false because, starting in July 2018, Gaia violated Exchange Act Rule 21F-17 when it included language in employee severance agreements which required employees to waive their rights to receive monetary incentives which are intended to encourage individuals to communicate directly with the Commission staff about possible securities law violations. Also, by this time, the Company

had even retaliated against the Whistleblower for raising legitimate concerns about issues such as reporting false subscriber figures to the investing public.

108.    Further, the statement was materially false and misleading because, due to known issues with the New Billing System, the Company was at an undisclosed heightened risk of reporting false subscriber figures to its investors (which, in turn, led to a risk of a false report on revenue growth), which it had done in the 1Q19 Report.

109.    On May 3, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 Report"). Attached to the 1Q21 Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

110.    The 1Q21 Report did not reveal any internal controls weaknesses. Instead, it stated, in relevant part:

> "Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of March 31, 2021, **our management has concluded that those disclosure controls and procedures are effective**."

(Emphasis added.)

111.    This statement was false because, starting in July 2018, Gaia violated Exchange Act Rule 21F-17 when it included language in employee severance agreements which required employees to waive their rights to receive monetary incentives which are intended to encourage individuals to communicate directly with the Commission staff about possible securities law violations. Also, by this time, the Company

had even retaliated against the Whistleblower for raising legitimate concerns about issues such as reporting false subscriber figures to the investing public.

112.    Further, the statement was materially false and misleading because, due to known issues with the New Billing System, the Company was at an undisclosed heightened risk of reporting false subscriber figures to its investors (which, in turn, led to a risk of a false report on revenue growth), which it had done in the 1Q19 Report.

113.    On August 2, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

114.    The 2Q21 Report did not reveal any internal controls weaknesses. Instead, it stated, in relevant part:

> "Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of June 30, 2021, **our management has concluded that those disclosure controls and procedures are effective**."

115.    This statement was false because, starting in July 2018 and continuing through August 2021, Gaia violated Exchange Act Rule 21F-17 when it included language in employee severance agreements which required employees to waive their rights to receive monetary incentives which are intended to encourage individuals to communicate directly with the Commission staff about possible securities law violations. Also, by this time, the Company had even retaliated against the Whistleblower for raising legitimate concerns about issues such as reporting false subscriber figures to the investing public.

116.    Further, the statement was materially false and misleading because, due to known issues with the New Billing System, the Company was at an undisclosed heightened risk of reporting false subscriber figures to its investors (which, in turn, led to a risk of a false report on revenue growth), which it had done in the 1Q19 Report.

117.    On November 1, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 Report"). Attached to the 3Q21 Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

118.    The 3Q21 Report did not reveal any internal controls weaknesses. Instead, it stated, in relevant part:

> "Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of September 30, 2021, **our management has concluded that those disclosure controls and procedures are effective**."

(Emphasis added.)

119.    This statement was materially false and misleading because the Company did not disclose the prior issues that led to it having inadequate internal controls. Specifically, it did not disclose its anti-whistleblower activities, the false subscriber figure and issues presented by the New Billing System. It also did not disclose that it had failed to remediate the prior issues, which led to an SEC investigation and eventual settlement.

120.    Further, the statement was materially false and misleading because, due to known issues with the New Billing System, the Company was at an undisclosed

heightened risk of reporting false subscriber figures to its investors (which, in turn, led to a risk of a false report on revenue growth), which it had done in the 1Q19 Report.

121.    On February 28, 2022, the Company filed with the SEC its 2021 Annual Report on Form 10-K for the Year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

122.    The 2021 Annual Report did not reveal any internal control weaknesses. Instead, it stated, in relevant part:

> "***Our management, with the participation of our Chief Executive Officer and Chief Financial Officer***, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K were effective*** in providing reasonable assurance that information required to be disclosed by us in reports that we file or submit under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, ***and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures***."

(Emphasis added.)

123.    This statement was materially false and misleading because the Company did not disclose the prior issues that led to it having inadequate internal controls. Specifically, it did not disclose its anti-whistleblower activities, the false subscriber figure and issues presented by the New Billing System. It also did not disclose that it had failed to remediate the prior issues, which led to an SEC investigation and eventual settlement.

124.    On May 2, 2022, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2022 (the "1Q22 Report"). Attached to the 1Q22 Report were certifications pursuant to SOX signed by Defendants Rysavy and Tarell attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

125.    The 1Q22 Report did not reveal any internal controls weaknesses. Instead, it stated, in relevant part:

> "Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of March 31, 2022, **our management has concluded that those disclosure controls and procedures are effective**."

(Emphasis added.)

126.    This statement was materially false and misleading because the Company did not disclose the prior issues that led to it having inadequate internal controls. Specifically, it did not disclose its anti-whistleblower activities, the false subscriber figure and issues presented by the New Billing System. It also did not disclose that it had failed to remediate the prior issues, which led to an SEC investigation and eventual settlement.

127.    On August 1, 2022, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2020 (the "2Q22 Report"). Attached to the 2Q22 Report were certifications pursuant to SOX signed by Defendants Tarell and Rysavy attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

128.    The 2Q22 Report did not reveal any internal controls weaknesses. Instead, it stated, in relevant part:

> "Our management, **with the participation of our Chief Executive Officer and Chief Financial Officer**, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) and Rule 15d-15(e) promulgated under the Securities Exchange Act of 1934. Based upon its evaluation as of June 30, 2022, **our management has concluded that those disclosure controls and procedures are effective**."

(Emphasis added.)

129.    This statement was materially false and misleading because the Company did not disclose the prior issues that led to it having inadequate internal controls. Specifically, it did not disclose its anti-whistleblower activities, the false subscriber figure and issues presented by the New Billing System. It also did not disclose that it had failed to remediate the prior issues, which led to an SEC investigation and eventual settlement.

130.    The statements contained in ¶¶ 23-32, 34-35, 39-40, 42, 43, 45, 49-51, 54, 55, 58-59, 63, 66-67, 70, 76, 77, 80, 84-85, 89-90, 94-95, 98, 105, 107, 109-110, 113-114, 117-118, 121-122, 124-125, 127 and 128 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's 1Q19 subscriber count was overstated because the Company included individuals who were not paying to access the Company's content; (2) the Company was motivated to artificially inflate its stock price (by reporting the false subscriber figure) due to prior stock declines on reports of slow subscriber growth, as well as, among other things, Gaia's acquisition activity over the second quarter of 2019, which involved paying for acquisitions in shares of Company

common stock; (3) the Company lacked adequate internal controls; (4) the Company lacked adequate internal controls due to, among other things, its anti-whistleblower activities as well as due to reporting false subscriber figures in one quarter; (5) the Company retaliated against an employee for raising legitimate and correct concerns about the accuracy of the subscriber figure the Company had reported to the public during the first quarter of 2019, (5) as a result of the foregoing, Defendants had a heightened risk of regulatory scrutiny and were ultimately subject to an SEC investigation and enforcement action; and (6) as a result of the foregoing, defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

131.    On November 7, 2022, the Whistleblower's allegations regarding the Company falsifying its subscriber numbers were publicly confirmed. On that day, the Company filed with the SEC its quarterly report on Form 10-Q, which revealed for the first time an SEC proceeding relating to the Company overstating its subscriber count. The 10-Q states in relevant part:

> ***In June 2020, Gaia received a request for voluntary production of documents in an investigation by the staff of the Denver Regional Office (the "Staff") of the U.S. Securities and Exchange Commission (the "SEC"). Since that time, Gaia has responded to the initial voluntary requests and subsequent subpoenas issued by the Staff***. In September 2022, Gaia and Gaia's Chief Financial Officer ("CFO") reached an agreement in principle with the Staff on a framework for a complete resolution of the investigation. ***The agreement in principle contemplates that Gaia would consent, without admitting or denying any findings, to the entry of an administrative order: (1) finding that Gaia (a) misstated in its April 29, 2019 earnings release and earnings call the number of paying subscribers for the period ending March 31, 2019, a quarter during which Gaia extended a free month of service to certain subscribers in the midst of a transition to a new enterprise-wide data system and (b) failed to comply with SEC whistleblower protection requirements with respect to the termination of one employee and the language used in severance agreements for other employees***; and (2) requiring Gaia to pay a

total civil monetary penalty of $2,000 over a one-year period for these violations. ***At the same time, the CFO would consent, without admitting or denying any findings, to the entry of an administrative order: (1) finding that the CFO caused Gaia's misstatements in the April 29, 2019 earnings release and earnings call that is described above***; and (2) requiring the CFO to pay a civil monetary penalty of $50.  The contemplated settlement with Gaia and the CFO involve violations that require only negligence rather than intentional conduct. There can be no assurance that the contemplated settlement will be finalized and approved.  Based on Gaia's agreement in principle with the Staff, however, Gaia has accrued a liability in the amount of $2,000. This liability is included in Accounts payable, accrued and other liabilities on the accompanying condensed consolidated balance sheets and as a separate line in the condensed consolidated statements of operations.

(Emphases added).

132.   This statement was materially incomplete because it did not disclose the extended time over which Gaia had engaged in anti-whistleblower activities. Further, it did not disclose that the termination of one employee was specifically related to that same employee bringing attention to the false statement regarding the 1Q19 subscriber count. Lastly, the statement, by characterizing the violations as ones which required the SEC to only show negligence, while technically true, materially understated the extent to which the Company engaged in wrongful conduct by leading investors to believe that the conduct at issue was the result of negligence when, in reality, the Company and certain of its employees had engaged in intentionally wrongful conduct.

133.   As discussed, on May 23, 2023, the SEC released the SEC Order. Kim Decl., Ex. 2. The SEC Order provided significant context and detail to the Company's activities.

134.   Per the SEC Order, "*[a]s a subscription-based internet streaming company, the number of paying subscribers was a key metric closely tracked by Gaia management and analysts.*" (Emphasis added). As discussed, the SEC Order

details how the price of the Company's stock had declined dramatically as a result of missing its subscriber growth expectations during the 4Q18, and how the Company was unable to meet its stated subscriber growth goal for 1Q19 without reporting a false figure for paying subscribers, which led to a 14% gain on the price of the Company's stock. Then, as a result of a Whistleblower raising concerns about the Company's reporting a false subscriber figure to the investing public, which the Company systematically ignored, the SEC Order reports how that Whistleblower then reported the false figure to the SEC. After reporting this violation to the SEC, the Whistleblower was terminated for cause. The SEC Order also discusses how, shortly after reporting the false subscriber figure, the Company issued shares of its common stock as consideration for acquisitions.

135.    The SEC Order also revealed details of 23 different severance agreements (the "Severance Agreements") that the Company had entered into between July 2018 and August 2021 with employees who were leaving the Company and receiving severance or other post-employment consideration. At issue was language in the Severance Agreements which purported to interfere with a former employee's right to monetary recovery in connection with any charge or complaint filed by the employee or anyone else with any governmental administrative agency, which includes the SEC.

136.    The Severance Agreements contained the following specific provision:

> Nothing in this Section shall be construed or deemed to interfere with any protected right to file a charge or complaint with any applicable federal, state or local governmental administrative agency charged with enforcement of any law, or with any protected right to participate in an investigation or proceeding conducted by such administrative agency. ***You are however waiving your right to any monetary recovery or other individual relief in connection with any charge or complaint filed by you or anyone else.***

> (Emphasis added).

137.    By requiring departing employees to forgo any monetary recovery in connection with providing information to the SEC, the SEC Order stated that Gaia "removed the "critically important financial incentives that are intended to encourage persons to communicate directly with the Commission staff about possible securities law violations."

138.    On this news (¶¶ 131-135), the price of Gaia stock declined by $0.11  or 4.1%, to close at $2.56 on May 23, 2023.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

139.    Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Gaia securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

140.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

141.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

142.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

143.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

144.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

145.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

146.    Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources

and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

147.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

### COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

148.    Plaintiffs repeat and realleges each and every allegation contained above as if fully set forth herein.

149.    This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

150.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

151.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

152.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

153.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them

or other Company's personnel to members of the investing public, including Plaintiff and the Class.

154.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

155.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

156.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

157.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

158.    Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

159.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

160.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

161.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

162.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)    awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 20, 2023                **THE ROSEN LAW FIRM, P.A.**

/s/ *Phillip Kim*
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Phillip Kim, an attorney, hereby certify that on October 20, 2023, I caused a true and correct copy of the foregoing "PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS" to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record denoted on the Electronic Mail Notice List.

I certify under penalty of perjury that the foregoing is true and correct. Executed on October 20, 2023.

/s/ *Phillip Kim*

Phillip Kim