**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com


Ian McDowell, Esq.
**THE ROSEN LAW FIRM, P.A.**
101 Greenwood Ave, Suite 440
Jenkintown, Pennsylvania 19046
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: imcdowell@rosenlegal.com

*Lead Counsel for Lead Plaintiff and Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-03267-GPG-STV

DANA ARMBRUSTER, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.


GAIA, INC.,
JIRKA RYSAVY, and
PAUL TARELL,

Defendants.

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

---

1

## I.     INTRODUCTION

Gaia is a streaming company that depends on paying subscribers for its revenue. Unlike Netflix, that caters to a wide audience, Gaia produces alternative content geared toward a niche audience. After missing a quarterly paying subscriber goal (causing a double-digit stock decline), Gaia set a target of 560,000 paying subscribers for the first quarter of 2019. Gaia could not reach 560,000 paying subscribers by the first quarter of 2019 ("1Q19") without resorting to fraud. Specifically, Gaia lost 20,000 paying subscribers due to undisclosed problems with its New Billing System (defined below). To meet the 560,000 target, defendant Paul Tarell ("Tarell"), Gaia's CFO, formulated a plan to offer those 20,000 lost subscribers free Gaia access. This plan was approved by defendant Jirka Rysavy ("Rysavy"), Gaia's CEO.

By the time Gaia reported its 1Q19 results, 15,000 of those lost subscribers were accessing Gaia content for free. Desperate to meet its 560,000 paying subscriber target and to avoid yet another stock price decline, Gaia counted the non-paying customers as paying—resulting in Gaia reporting 562,000 paying subscribers to investors, beating its target. On this news, Gaia stock went up by over 14%. Gaia then ignored an employee (the "Whistleblower") who raised internal concerns about the falsity of this subscriber count, and then retaliated after the Whistleblower reported to the SEC that the Company had reported a false subscriber figure to investors.

Gaia also had undisclosed material internal control deficiencies in its control environment, control activities, and information and communication. Throughout the Class Period, Gaia included language in employee severance agreements which

required employees to waive their rights to receive monetary recovery or any other individual relief for reporting wrongdoing to the government, in violation of Exchange Act Rule 21F-17. Additionally, Gaia reported a false number of subscribers to its investors for 1Q19. Gaia subsequently ignored and ultimately retaliated against an employee who raised concerns about the falsity of the 1Q19 subscriber count. Further, Gaia never disclosed issues with the New Billing System.

As the truth of the Company's internal control weaknesses and subscriber issues began to leak into the market and materialize through partial corrective disclosures, the price of GAIA's stock fell, damaging investors. Plaintiffs have adequately pleaded a securities fraud case. Defendants' motion to dismiss (the "MTD") should be denied.

## II.    Factual Background

### A. Gaia and the Individual Defendants.

Defendant Gaia purports to be a "member-supported global video streaming service and community." ¶ 13.[1] As a streaming Company, Gaia depends on paying subscribers for its revenues. Gaia stated in its latest annual report that "revenues are primarily from subscription fees for services related to streaming content of our members." ¶ 15.

At all times from December 26, 2017 through November 7, 2022 (the "Class Period"), Gaia's common stock traded on the NASDAQ Stock Exchange (the "NASDAQ"). ¶ 12. Rysavy founded Gaia, and at all relevant times served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the

---

[1] Unless otherwise specified, all paragraph references are to the Second Amended Complaint ("SAC") (ECF No. 39).

"Board"). ¶¶ 14, 16. Defendant Paul Tarell ("Tarell") served as the Company's Chief Financial Officer ("CFO") throughout the Class Period, and resigned from the Company in June 2023. ¶ 17. On October 30, 2023, Gaia that Rysavy was stepping down as CEO, effective December 4, 2023. Tarell and Rysavy were forced out due to the fraud.

## B. Defendants Mislead Investors About Gaia's Number of Paying Subscribers.

On March 4, 2019, when reporting its results for the 2018 fiscal year, Gaia reported disappointing subscriber numbers for the fourth quarter of 2018. ¶ 42. As a result, Gaia stock fell by $1.76 per share, or 15%, to close at $9.64 per share on March 5, 2019. The next day, Gaia stock declined an additional $0.83 per share, or 9%. ¶ 44. In the wake of this bad news, Gaia sought to manage expectations for the upcoming quarter's (the first quarter of 2019, or "1Q19") results. To this end, Tarell told investors that Gaia expected to "report around 560,000 subscribers for Q1." ¶ 43.

During 1Q19, Gaia switched from its legacy billing software to a new billing system (the "New Billing System" or the "System"). ¶ 45. This switch did not go well. The New Billing System was overseen by Tarell. Tarell oversaw the process to calculate the paying subscriber figure and how many paying subscribers Gaia actually had. *Id.* The System's issues were so serious that it actually caused Gaia to lose nearly 20,000 subscribers, based on an internal review of historical subscriber attrition rates. ¶ 4. Gaia never disclosed the issues with the System to its investors. *See* ¶ 45.

In a bid to retain a portion of the 20,000 subscribers lost to issues with the System, Tarell proposed, and Gaia approved, a plan to give the lost subscribers a free month of access. ¶ 5. Gaia then emailed the 20,000 subscribers offering a free month of

service, and requesting them to submit updated payment information. *Id.* Of the 20,000, 4,500 had pre-paid for Gaia access through the month, and 500 reactivated their accounts by the end of March, 2019. ¶ 48. This left 15,000 with access to Gaia content who had neither pre-paid for Gaia access nor updated their payment details. ¶ 5. Gaia then included these 15,000 *non-paying* individuals as *paying* subscribers for the first quarter of 2019. *Id.*

Crucially, including these 15,000 *non-paying* individuals as *paying* subscribers allowed Gaia to *exceed* its target of 560,000 subscribers for 1Q19. On April 29, 2019, Gaia issued a press release falsely announcing that it had *562,000* paying subscribers for 1Q19. ¶ 49. Gaia reported this subscriber growth led to a 36% increase in revenues. *Id.* On Gaia's 1Q19 earnings call, Tarell explicitly denied that Gaia was counting nonpaying subscribers. Exceeding the target was well received by investors—Gaia stock went up $1.29 per share, or 14%, to close at $10.58 on April 30, 2019. ¶ 57.

Capitalizing on Gaia's artificially inflated stock price, Gaia used 404,891 shares of its stock to purchase a streaming platform focused on Alternative Healing, in June 2019. ¶ 63. Gaia simultaneously announced that, during 2Q19, it had issued 79,941 shares of its stock to acquire 450 titles of original content. *Id.*

## C. Defendants Mislead Investors About the Adequacy of Gaia's Internal Controls; Take Affirmative Steps to Conceal Fraud; SEC Takes Action

Defendants falsely told investors it had adequate internal controls. At the start of the Class Period and continuing throughout, Defendants took increasingly material steps to prevent the reporting of misconduct within the Company. At the start of the Class Period, Defendants violated Exchange Act Rul 21F-17 by including language in

employee severance agreements which required employees to waive their rights to certain monetary incentives which are intended to encourage individuals to report possible securities law violations to the SEC. ¶¶ 33, 36, 41, 53, 60, 68, 78, 86, 91, 96, 107, 111, 115. In particular, the language stated that while nothing in the section at issue should be construed to interfere with any right to file a charge or complaint with any applicable governmental administrative agency, or the right to participate in an investigation or proceeding "***[y]ou are however waiving your right to any monetary recovery or other individual relief in connection with any charge or complaint filed by you or anyone else***." (Emphasis added). ¶ 136.

Defendants further lacked adequate internal controls because they later falsely reported paying subscriber numbers. ¶ 49. Defendants also never disclosed that the System's issues had caused Gaia to lose subscribers, leading it to offer free service to over 20,000 individuals, and that Gaia was at a heightened risk of reporting a false subscriber figure to its investors as a result of issues with the System. *See* ¶ 88. Realizing Gaia had reported a false subscriber figure to its investors, the Whistleblower raised the issue to senior management. ¶ 61. Gaia ignored the issue and refused to take any action to correct the misstatement. *Id.*

On March 16, 2020 the Whistleblower filed a complaint with the SEC. ¶ 87. In response, Gaia retaliated. In an email to the Whistleblower, Gaia terminated the Whistleblower "***for cause***" for making "***unfounded complaints*** that required a significant expenditure of company resources to fully investigate". ¶ 92 (emphasis added). These issues led to an SEC investigation and eventual settlement. Gaia never

disclosed the existence of the SEC investigation to its investors while it was ongoing. ¶ 3.

On November 7, 2022, Gaia disclosed in a 10-Q (the "3Q22 10-Q") that, in June 2020, it had received a request for voluntary production of documents by staff from the SEC's Denver regional office. ¶ 131. In September 2022, Gaia and Tarell reached an agreement in principle with the SEC to resolve the matter. *Id.* The agreement contemplated that Gaia would consent to the entry of an administrative order (1) finding that Gaia had (a) misstated in its 1Q19 earnings release and earnings call the number of paying subscribers for the period ending March 31, 2019, and (b) that Gaia had "failed to comply with SEC whistleblower protection requirements with respect to the termination of one employee and the language used in severance agreements for other employees", and requiring Gaia and Tarell to pay certain penalties. *See Id.* Gaia understated the extent of its wrongdoing by stating that the "contemplated settlement [. . .] involve violations that require only negligence rather than intentional conduct". ¶ 131. Gaia did not disclose the extended period over which it had engaged in anti-whistleblowing activity or state that the termination of one employee was connected to Gaia's reporting a false paying subscriber figure for 1Q19. *See* ¶¶ 131-132.

On May 23, 2023, the SEC published an Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order (the "SEC Order" or the "Order"), filed as Dkt. No. 31-3, which provided additional detail showing that Gaia had acted intentionally in reporting the materially

false 562,000 subscriber figure to investors, and retaliating against the Whistleblower.
*See generally* ¶¶ 133-7. On the news of the SEC Order, Gaia stock declined by 4.1% to
close at $2.56 on May 23, 2023. ¶ 138.

### III.   ARGUMENT

### (A). Plaintiffs Sufficiently Allege False or Misleading Statements and Omissions

F.R.C.P. (9)(b) provides that fraud should be pleaded with particularity, which
means that the complaint must plead with "particularity", the "who, what, when, where,
and how" of the purported securities fraud. *See Koch v. Koch Indus.*, 203 F.3d 1202,
1236 (10th Cir. 2000). Neither the PSLRA nor Rule 9(b) require a plaintiff to plead
evidence in their complaint. *Croker v. Carrier Access Corp.*, No. CIV.05CV01011LTB-
OES, 2006 WL 2035366, at *12 (D. Colo. July 18, 2006).

Plaintiffs have plead the "who, what, when, where, and how" of Gaia's false and
misleading statements. Plaintiffs plead that Tarell (who oversaw the process for
determining the number of paying subscribers) knew that Gaia had lost paying
subscribers due to issues with the System, and then emailed 20,000 former subscribers
to try and gain back their business. ¶¶ 4, 45, 47. Despite this knowledge, Gaia then
issued a press release in which it claimed to have achieved 34% subscriber growth for
1Q19, and an increase to 562,000 paying subscribers, which, as discussed, was false.
¶ 49. Gaia did this in order to reach a 560,000 paying subscriber target that Tarell had
set on the March 4, 2019 earnings call. ¶ 43.

On the corresponding 1Q19 earnings call, Tarell doubled down and explicitly
denied including non-paying subscribers who had had their credit cards declined. He

stated "[w]e ended the quarter with 562,000 paying subscribers, *[which reflects the]*
*exclusion of subscribers for whom we were unable to successfully charge on our*
*last renewal due to their credit cards becoming invalid*." ¶ 55. (Emphasis added).

Defendants argue that the Complaint "does not even allege an internal control
weakness, *nor that the company disclosed an internal control weakness as a*
*result of the subscriber count issue (because it did not and was not required to)."*
MTD, at 12 (emphasis added). This is false. Plaintiffs allege that Defendants maintained
ineffective internal controls because Defendants engaged in anti-whistleblowing activity
by requiring employees to waive their rights to receive monetary rewards for reporting
wrongdoing to the government in Gaia's severance agreements, in violation of
Exchange Act Rule 21F-17. ¶¶ 33, 36, 41, 53, 60, 68, 78, 86, 91, 96, 107, 111, 115.

Subsequently, Plaintiffs allege that Defendants maintained ineffective internal
controls because they reported a false paying subscriber figure to Gaia investors while
they were continuing to include the illegal language in severance agreements. *See* ¶¶
52-53, 60-61, 68, 78, 86, 91. Plaintiffs also allege that Gaia maintained inadequate
internal controls because Gaia retaliated against a Whistleblower who reported to the
SEC that Gaia had reported a false subscriber figure to the public. ¶¶ 86-87, 92. These
internal control deficiencies pertain to three categories of internal controls, the control
environment, control activities, and information and communication.[2]

Defendants add that because, "*Gaia did not disclose any weakness in*

---

[2] The Public Company Accounting Oversight Board ("PCAOB") has published  guide summarizing the
categories of the types of internal controls over financial report.  *https://pcaobus.org/news-*
*events/speeches/speech-detail/a-layperson-s-guide-to-internal-control-over-financial-reporting-(icfr)* (last
checked December 20, 2023).

***internal controls over financial reporting or disclosure controls or procedures***"
there must not be any weakness in internal controls, is meritless. MTD at 12, fn. 7
(referencing the 3Q22 10-Q). That Defendants have not admitted there are internal
control weaknesses, does not mean there were none. If this were true, one could never
allege a securities fraud claim without an admission by a defendant. *E.g.*, courts have
found that "the fact that the financial statements for the year in question were not
restated does not end [plaintiff's] case." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83
(1st Cir. 2002) (upholding complaint alleging securities fraud even in light of an auditor's
subsequent clean audit opinion on allegedly misstated financial results). *See also In re
Chicago Bridge & Iron Co. N.V. Sec. Litig.,* No. 17 CIV. 01580 (LGS), 2019 WL
5287980, at *25-32 (S.D.N.Y. Oct. 18, 2019) (finding corrective disclosure of GAAP
violations based on analyst reports without a restatement).

Plaintiffs also allege that Rysavy and Tarell signed certifications pursuant to the
Sarbanes-Oxley Act of 2002 ("SOX") (and attached to Gaia's filings on Forms 10-K and
10-Q), which contained language attesting to the accuracy of financial reporting, the
disclosure of any material changes to Gaia's internal controls, and the disclosure of all
fraud. ¶¶ 27, 29, 31, 34, 39, 50, 58, 66, 76, 84, 89, 94, 105, 109, 117, 124, 127. Rysavy
and Tarell signed these statements even though Gaia was engaging in the wrongful
conduct discussed above. *See Id.*

**(B). Plaintiffs Adequately Allege Defendants' Scienter**

The PSLRA requires plaintiffs to allege facts which give rise to a "strong
inference" that the defendants acted with scienter. 15 U.S.C. § 78u4(b)(2). "One of the

classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting their public statements were materially inaccurate." *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1297 (N.D. Okla. 2010), *on reconsideration in part* (July 30, 2010). "[T]o establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors. *City of Philadelphia v. Fleming Companies, Inc.,* 264 F.3d 1245, 1261 (10th Cir. 2001).

In assessing scienter, the court "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 326 (2007). The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences." *Id.* at 324. Further, "[t]he requirement of knowledge in this context may be satisfied under a reckless standard by the defendants' knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *City of Philadelphia*, 264 F.3d 1245 at 1261.

Plaintiffs allege numerous facts which, when considered holistically, show a strong inference of scienter.

First, Defendants were aware of and/or had access to the truthful information at the time the false and misleading statements were issued. *See Emps. Ret. Sys. Of*

*Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2014) (evidence supporting scienter includes when defendants "knew facts or had access to information suggesting that their public statements were not accurate.") Plaintiffs allege that Defendants knew that they had falsely reported that Gaia had 562,000 subscribers for 1Q19, considering their intimate knowledge of issues with the System, and attempts to recover subscribers who had been lost due to the issues with the System prior to the false statement. Tarell oversaw and tracked Gaia's paying subscriber figure. He was aware that Gaia lost 20,000 subscribers due to issues with the System. ¶ 4. Tarell formulated a plan to retain a portion of those 20,000 lost subscribers and suggested that Gaia email the lost subscribers to gift them a free month of Gaia content access, and inviting them to submit updated payment details. ¶ 5. According to the SEC Order, Tarell's plan was approved by Gaia's "Management." Order ¶ 8. The Court may infer that defendant Rysavy approved Tarell's plan because it is not plausible that Tarell's subordinates would have the authority to approve such a plan. Gaia was then told internally by the Whistleblower that it had reported non-paying subscribers as being paying subscribers. *Id.*

Rysavy and Tarell also had knowledge and direct review of Gaia's internal controls—as attested in their SOX certifications. Moreover, Gaia stated in each of its annual reports on Form 10-K that its management (including Rysavy and Tarell) conducted an evaluation of the effectiveness of the design and operation of Gaia's disclosure controls and procedures. *See* ¶¶ 28, 40, 77, 106, 122. Therefore, Rysavy and Tarell had access to Gaia's internal control information.

Second, Defendants tried to cover-up their misconduct. Courts hold that efforts to cover up misconduct support a strong inference of scienter. *See In re Nature's Sunshine Products Securities Litigation*, 486 F.Supp.2d 1301, 1310 (D. Utah 2007) ("[e]vidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter"); *see also S.E.C. v. Lucent Technologies, Inc.*, 363 F.Supp.2d 708, 717 (D.N.J. 2005) ("common sense dictates that actions taken after the fraud occurred can be circumstantial evidence that the defendant had acted with the requisite state of mind"). Defendants took affirmative steps to prevent whistleblowing, in violation of Exchange Act Rule 21F-17, by including language in severance agreements stating that former employees were waiving their rights relating to financial rewards for reporting wrongdoing. ¶¶ 33, 36, 41, 53, 60, 68, 78, 86, 91, 96, 107, 111. Then, after reporting a false paying subscriber figure to investors, Defendants ignored the Whistleblower, who had identified that Gaia reported a false figure to subscribers, and then retaliated against the Whistleblower through termination of employment for cause. ¶ 5.

Third, the SEC enforcement action and settlement is probative of scienter. The Order specifically sets forth facts demonstrating knowledge or access to truthful information by Defendants. The Order stated that Gaia and Tarell realized Gaia had lost 20,000 subscribers, a metric Gaia closely tracked, due to the System. *See* SEC Order ¶¶ 6-7. The Order details how Tarell suggested Gaia give the lost subscribers free access, which Gaia approved. *See* ¶ 8.

Defendants argue that the SEC only charged Gaia with violations which require the SEC to show negligence, not scienter-based allegations. *See* MTD at 8-9. The

SEC's decision on which charges to bring does not mean those same facts could not be used to show scienter. "[T]here is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims under the PSLRA.'" *Vanleeuwen v. Keyuan Petrochemicals, Inc.,* No. 13 Civ. 6057 (PAC), 2014 WL 3891351 at *4 (S.D.N.Y. Aug. 8, 2014) (internal citations omitted) (crediting facts from a nonfraud books and records complaint in finding a strong inference of scienter).

Fourth, Defendants had motive to commit fraud. The inflated subscriber numbers exceeded a previously set goal and artificially inflated the Company's stock price. *See* ¶ 5. Shortly thereafter, Gaia used its stock to purchase a streaming company. In *In re Verifone Holdings, Inc. Securities Litigation*, 704 F.3d 694, 710 (9th Cir. 2012, the 9th Circuit found scienter where defendants had "remedied" margins and earnings results that fell short of projections "by directing baseless adjustments to the company's financial statements, failing to inquire further once projections were met at the same time they encouraged employees to engage in 'aggressive' accounting to ensure VeriFone hit other financial targets." *See also Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 455 (S.D.N.Y. 2007) (motive sufficient where "one party to a sale had a financial incentive to 'paint a far rosier financial picture than actually existed in order to induce' the other party into a sale.")

Fifth, the departure of management is supportive of scienter. Tarell was Gaia's CFO from the beginning of the Class Period until June 26, 2023, slightly over a month after the Order was released. ¶ 17. Then, on October 30, 2023, Rysavy announced he was stepping down as CEO, which became effective on December 4, 2023. Upon

information and belief, Rysavy and Tarell, Gaia's top two leaders, left their respective roles as CEO and CFO shortly after the Order was released because it became untenable for them to remain in those roles once their wrongful behavior had been revealed. *See In re Impax Labs., Inc., Secs. Litig.,* No. C 04-04802 JW., 2007 WL 7022753 at *10 (N.D. Cal. July 18, 2007) (finding that individual defendant departure provides "minimal, non-dispositive supporting evidence of scienter"), *reconsidered on other grounds.*

Defendants' scienter arguments are off the mark. Defendants argue that Plaintiffs cannot show scienter because Gaia inquired into the issue of whether Gaia had reported a false subscriber figure to investors for 1Q19 after the Whistleblower raised concerns. MTD, at 18. This is meritless. Defendants omit that Gaia retaliated against the Whistleblower after the Whistleblower reported the violation to the SEC. See *Id.* The most plausible inference from these facts is that Gaia's "inquiry" was merely a whitewash. [3]

Defendants also argue that Gaia's reporting nonpaying customers as paying customers was an innocent mistake. *See* MTD, at 2, 18. This is not borne out by the facts.  Tarell knew the System's issues were serious enough that the System caused Gaia to lose over 20,000 subscribers. ¶ 4. Tarell then proposed that Gaia email the 20,000 lost subscribers to offer them a free month of  access, which was approved by

---

[3] For scienter, Defendants chiefly rely on *In re Gold Res. Corp. Sec. Litig.,* 776 F.3d 1103 (10th Cir. 2015), which is distinguishable. In *In re Gold*, plaintiff's allegations centered around a mine in Mexico, 2,000 miles from the defendant company's Denver headquarters, and where employees in Mexico did not tell upper management in Denver of the potential overbilling issue once they learned of certain discrepancies. *See Id.* at 1106, 1114. Here, the issues were known at the top from the start.

Gaia management. ¶ 5. Gaia then emailed the 20,000 lost subscribers as per this plan.
This effort failed to get Gaia over 560,000 paying subscribers, but Gaia told investors it
had hit its 560,000 target anyway. Further, the Complaint alleges that Defendants never
disclosed the issues with the System. ¶¶  52, 62, 69, 79, 88, 93, 97, 108, 112, 116, 120.

**(C). Plaintiffs Sufficiently Plead Materiality.**

A fact is material if there is a "substantial likelihood that the disclosure of . . . [the]
omitted fact would have been viewed by the reasonable investor as having significantly
altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S.
224, 231-32 (1988). Whether a false statement is material is a "mixed question of law
and fact" that is rarely appropriate for a decision on the face of the pleadings. *TSC
Indus. v. Northway,* 426 U.S. 438, 450 (1976); *see No. 84 Employer-Teamster Joint
Council Pension Trust Fund v. Am. W. Holding Corp*., 320 F.3d 920, 934-35 (9th Cir.
2003) (declining to adopt a bright-line rule to determine materiality, engaging in the fact-
specific inquiry required by *Basic*, and finding that the plaintiffs had sufficiently pleaded
materiality).

Courts rarely dismiss cases on the basis of materiality. *See Steamship Trade
Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc*., et al, 1:22-cv-
08228 (S.D.N.Y. 2023), Dkt. No. 71, at 11 (rejecting argument that a misstatement
wasn't material because the inflated figure was allegedly inflated by slightly over 2%
and noting that materiality is rarely a "basis for dismissal on the pleadings") (internal
citation omitted), *aff'd*, Dkt. No. 105 at 27-29. Plaintiffs have satisfied this standard.

Preliminarily, Defendants do not contest, and thus concede, that internal control

statements are material. Gaia is a streaming company, and largely depends on payments from paying subscribers for its revenues. As such, the number of paying subscribers is a key metric for Gaia investors. SEC Order ¶ 6. The Complaint alleges that after a quarter where Gaia missed its paying subscriber target, the stock went down 15%. Subsequently, Gaia lied about its paying subscriber figure so that it would hit its 560,000 paying subscriber target. As a result of this misstatement, Gaia stock went up 14%. Accordingly, Plaintiffs have adequately pleaded that the paying subscriber figure is a key metric and, as such, is material to investors.

Defendants contend that subscriber figures are not material because it is a non-GAAP measure. This is meritless. Preliminarily, it is telling that Defendants do not cite a single case actually holding that non-GAAP measures are per se immaterial. *See generally* MTD. Further, Defendants' argument is based on a false premise. According to the SEC, the number of subscribers is "not" a "non-GAAP financial measure." *See* https://www.sec.gov/corpfin/cf-manual/topic-8.

In any event, Defendants cases are off the mark.[4] *In re Alamosa Holdings, Inc.*,

---

[4] Defendants' citation of *Crutchfield v. Match Group, Inc.*, 529 F. Supp. 3d 570, 592 (N.D. Tex. 2021) is distinguishable and off-base. In *Match*, plaintiffs in part alleged that Match's revenue growth was caused in part by "widespread fraudulent accounts consisting of scammers and 'bots'[.]". *Id.* at 577. Plaintiffs asserted that Match omitted that its financial results included "data from fraudulent accounts, including paid subscriptions, by 'scammers, fraudsters, 'bots,' [and] sex offenders[. . ]." *Id.* at 583. In sum, plaintiffs alleged that Match did not disclose that its financial results were driven, at least in part, by unsavory paying customers. Match didn't state that it had more paying subscribers than it did to meet a projection. Defendants' citation of *In re AT&T/DirecTV Now Sec. Litig.,* 480 F.Supp.3d 507, 2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020) is off the mark. In *AT&T*, Plaintiffs alleged that three sales associates (who were confidential witnesses), plus an unspecified number of unnamed coworkers, helped create fake accounts, and that fraudulently created accounts were quickly deleted. *See Id.* at 528.

382 F. Supp. 2d 832, 852 (N.D. Tex. 2005), actually supports Plaintiffs. MTD, at 10. In

*Alamosa*, the court held that the subscriber figure was "immaterial as a matter of law" in

context, because "[i]f the entire alleged amount of 1,000 [alleged fictitious subscribers]

were removed from the fourth-quarter 2001 amount and the entire year-end amount,

Alamosa **would have still reached its projected numbers**." *See Id.* (Emphasis added)

By contrast, Gaia would not have hit its 560,000 paying subscriber target for 1Q19

without including 15,000 non-paying subscribers.

Defendants further argue that "without uniform standards, subscriber counts are

inherently estimates and cannot be reasonably relied upon absent a disclosure of the

methodology used for the calculation." MTD, at 9. This argument is nonsense.

Defendants reported 562,000 subscribers at the end of 1Q19. This was not an estimate,

nor did they ever couch it as an estimate.

Many metrics can be material. In *Indiana Public Retirement System v.*

*Pluralsight*, 45 F.4th 1236, 1250 (10th Cir. 2022), the Tenth Circuit affirmed a district

---

In this alleged scheme, "[t]hose [fraudulent] accounts would have had no effect on
AT&T's reported net additions for DTVN, because every such account opening was
accompanied by an immediate account closing, which, by definition, nets zero for the
quarter." *Id.* (emphasis added). In context, the court held that "[p]laintiffs have not
plausibly alleged that employee misconduct affected more than a tiny percentage of
AT&T's subscription figures for DVTN a product that is, in turn, only a slice of AT&T's
video business, which is a subset of the Entertainment segment, which is, in turn, less
than a third of AT&T"s overall business." *Id.* In addition, plaintiffs in *AT&T* provided no
facts showing that the individual defendants were aware of the firing of the AT&T
employees who created fake subscriptions, given how few employees had engaged in
the scheme. *See Id.* By contrast, Plaintiffs have pleaded facts showing that Gaia's
management was aware of the falsity of the subscriber figure given to investors for
1Q19, and that that misstatement enabled Gaia to hit its target number. Gaia is also
different from AT&T in that Gaia's business activities are principally focused on
streaming and revenues from streaming. Gaia's subscriber number is important enough
that the CFO oversees the process for calculating subscribers.

court's ruling that the defendant CFO's statement that the company had "about 250" quota-bearing sales representatives was material, considering it only had 200 quota-bearing sales representatives at that time.

**(D). Plaintiffs Adequately Allege Loss Causation**

To plead loss causation, a plaintiff need only allege a "short and plain statement" (*Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 346 (2005)) of a causal connection between the revelation of truth to the marketplace and losses sustained by the plaintiff. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1154 (10th Cir. 2015). Plaintiffs allege that the truth of Gaia's internal control weaknesses concerning its subscriber count and whistleblower policies slowly leaked into the market through partial corrective disclosures and materialized, causing Gaia stock to fall.

On December 17, 2018, *Seeking Alpha* published an article entitled "Gaia: Substantial Downside Remains". This article called into question Gaia's growth prospects and stated that Gaia's eventual "growth target is likely to prove unachievable[.]", raising doubts about Gaia's ability to meaningfully grow its subscriber base. *See* ¶ 37. On this news, Gaia stock declined by 5%. *See* ¶ 38. Gaia never responded to this article, continued to issue misstatements about the adequacy of its internal controls, and took efforts to thwart whistleblower activity in violation of Exchange Act Rule 21F-17. *See e.g* ¶¶ 39-41, 50-51, 53, 58-62, 66-69, 76-79, 87-97, 105-128. Then, on April 29, 2019, Gaia issued its false Q1 subscriber number of 562,000. ¶ 49. On September 23, 2019, after market hours, *Seeking Alpha* published an article entitled "Gaia's Inflection Point." According to this article, Gaia expended

"significant capital to capture subscribers" and emphasized how "steep" the cost to reel in users had been. ¶ 64. The author then raised doubts about the future rate of subscriber growth. *Id.* On this news, Gaia stock declined by 7.3%. *See* ¶ 65.

On December 18, 2019, *Seeking Alpha* published an article entitled "Gaia Inc.: Downward Dog – Failed Spin-Offs and Newly Uncovered Information Highlights Potentially Higher Subscriber Churn, 70% downside". ¶ 72. This article questioned the propriety of Gaia's business and how it counted subscribers, through highlighting instances of customers being unable to cancel their subscriptions. *Id.* The author's general assertion that Gaia resorted to improper measures with regards to its subscribers proved to be accurate. On this news, Gaia stock declined by 1.27%. ¶ 75.

On February 14, 2021 and February 17, 2021, *Business Insider* released two articles discussing how Gaia's business environment was one in which Tarell and Rysavy were controlling and domineering, and how employees generally feared Rysavy and Tarell. *See* ¶¶ 102-103. On this news, Gaia stock fell 2% on February 17, 2021. *See* ¶ 104. This serves as a corrective disclosure because it emerged that, consistent with the environment portrayed in the articles, where Rysavy and Tarell were domineering and controlling, Gaia retaliated against the Whistleblower.

In response to these articles, Gaia continued to state that it had no issues with its internal controls, even after it reported a false subscriber figure to the public and retaliated against the Whistleblower.

Gaia partially disclosed its wrongful conduct in the 3Q22 10-Q by admitting that it reached an agreement in principle with the SEC. The disclosure was materially

incomplete because it did not disclose the extended time over which Gaia had
prevented whistleblowing, or that the Whistleblower's termination was connected to
Gaia overcounting its subscribers. *See* ¶ 132. The true and complete details of the fraud
was disclosed on May 23, 2023, when the SEC released the Order. ¶ 132. This caused
Gaia stock to fall 4.1%. ¶ 138. These facts are sufficient to allege loss causation.[5]
Defendants' argument (for which they do not cite a single case) that the Order is not a
corrective disclosure because it was issued by the SEC lacks merit. *See* MTD, at 21.

Defendants argue that the articles discussed above are not partially corrective
disclosures because, in an efficient market, the truth is already known. MTD, at 21. This
argument is wrong on several levels. First, the "truth on the market" is an affirmative
defense not appropriate for resolution on a motion to dismiss. *See Ganino v. Citizens
Utilities Co.,* 228 F.3d 154, 167 (2d. Cir. 2000) (holding that the "truth-on-the-market
defense is intensely fact-specific and is rarely an appropriate basis for dismissing a §
10(b) complaint for failure to plead materiality."). Truth on the market is very fact
intensive and for it to succeed the truthful information must enter the market with the
same intensity and credibility to counteract the false and misleading information. *See In
re Apple Computer Securities Litigation,* 886 F.2d 1109, 1114 (9th Cir. 1989). Here,
following the partial corrective disclosures, the Company continued to issue
misstatements about its internal controls and subscribers.

Additionally, even assuming that the partial corrective disclosures did not reveal

---

[5] That a corrective disclosure occurs after the close of the class period is a non-issue.
*See In re Dura Pharmaceuticals, Inc. Securities Litigation,* 452 F.Supp.2d 1005, 1023
(S.D. Cal. 2006)

any "new" information (they do), this does not foreclose loss causation. *See Garcia v. Hetong Guo*, No. CV-15-1862-MWF-MRWX, 2016 WL 102213, at *11 (C.D. Cal. Jan. 7, 2016) (holding that even where disclosure contained no new facts, where it tends to add credibility, intensity, or is otherwise more authoritative to prior disclosure, the disclosure is adequate for loss causation) (quoting and citing *In re Apollo Grp., Inc., Sec. Litig.,* No. 08-16971, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010)).

Defendants cite *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) for the assertion that a third-party analyst's (such as the writers of the *Seeking Alpha* articles) opinion does not qualify as a corrective disclosure, as the information was already known in an efficient market. MTD at 20. *Meyer v. Greene* is not binding on this Court. In *Turner Insurance Agency, Inc. v. Farmland Partners Inc.*, No. 18-cv-02104-DME-NYW, 2019 WL 2521834 at *2, 7 (D. Colo. Jun. 18, 2019), the court rejected defendants' argument that because the defendant company's stock traded in an efficient market, a *Seeking Alpha* article describing wrongful conduct was not a corrective disclosure and declined to follow *Meyer v. Greene. See Id.* at *7. Indeed, "courts acknowledge that information in a corrective disclosure can be new "in a practical sense." *Id.* (Internal citation omitted).

## IV.  CONCLUSION

For the reasons set forth above, the Motion should be denied in its entirety. Defendants contest Plaintiffs' Section 20(a) claims only on the basis that the underlying Section 10(b) claim should be dismissed. MTD at 22. Because those arguments fail, the Court should sustain Plaintiffs claims under Section 20(a) of the 1934 Act.

Dated:  December 20, 2023              Respectfully submitted,

*/s/Phillip Kim*
Phillip Kim
**The Rosen Law Firm, P.A.**
275 Madison Avenue, 40th Floor New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

And,

Ian McDowell, Esq.
**THE ROSEN LAW FIRM, P.A.**
101 Greenwood Ave, Suite 440
Jenkintown, Pennsylvania 19046
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: imcdowell@rosenlegal.com

*Lead Counsel for Lead Plaintiff and Class*

## CERTIFICATE OF SERVICE

I, Phillip Kim, hereby declare under penalty of perjury as follows:

I am an attorney at The Rosen Law Firm, P.A., with offices at 275 Madison Ave, 40th Floor, New York, NY 10016. I am over the age of eighteen.

On December 20, 2023, I caused a true and correct copy of the following **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on December 20, 2023.

_/s/ Phillip Kim_
Phillip Kim